## In re SILICON GRAPHICS, INC. SECURITIES LITIGATION.

No. C 96–0393 FMS.

United States District Court, N.D. California.

May 23, 1997.

Patrick J. Coughlin, William S. Lerach, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Richard Bemporad, William J. Ban, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, for plaintiffs.

Bruce G. Vanyo, Lloyd Winawer, Jerome F. Birn, Jr., Wilson Sonsini, Goodrich & Rosati, Palo Alto, CA, for defendants.

## ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT; SCHEDULING ORDER

FERN M. SMITH, District Judge.

### INTRODUCTION

In September 1996, the Court dismissed plaintiffs' class and derivative securities fraud actions against defendants with leave to amend. In October 1996, plaintiffs filed an amended class action complaint. Defendants now renew their motion to dismiss, arguing that plaintiffs' allegations against

them are insufficient as a matter of law. Certain individual defendants also move for summary judgment, arguing that they did not undertake the conduct alleged by plaintiffs. These motions require the Court to discern the proper pleading standards under the Private Securities Litigation Reform Act of 1995, to apply them to plaintiffs' complaint, and to determine whether defendants' motion for summary judgment is procedurally proper.

## BACKGROUND

Defendant Silicon Graphics, Inc. ("SGI") is a Delaware corporation that designs and sells desktop graphics workstations, multi-processor servers, advanced computing platforms, and application software. The company's stock is traded on the New York Stock Exchange. Plaintiffs' complaint arises out of fluctuations in SGI's stock price during the fall of 1995.

On August 21, 1995, SGI stock reached an all-time high of $44–7/8 before declining into the high $20s due to investor concern that SGI would be unable to maintain its historic high growth rates in the face of increased competition. On October 19, 1995, SGI announced the results for the first quarter of fiscal year 1996. The market viewed these results as disappointing, although they showed a thirty-three percent growth in revenue. SGI reassured analysts and investors that it still expected to meet its growth targets. In a press release, and also in a conference call with analysts, SGI provided explanations for the shortfall and suggested reasons why the second quarter results would be better. SGI issued periodic updates throughout the fall, reasserting its confidence about second quarter results. As a result, the stock price rebounded into the high $30 range.

In December 1995, on rumors that the second quarter results might also be lower than anticipated, the stock fell again, this time dipping into the mid-$20 range. When

SGI confirmed the rumors in early January 1996, the stock fell to a low of approximately $22 per share. In response, plaintiffs filed their first class action complaint on January 29, 1996. A derivative action was filed on March 22, 1996. Both complaints related to the December 1995/January 1996 drop in SGI's stock price.

In September 1996, the Court dismissed the class action complaint for failure to plead scienter adequately under the Private Securities Reform Act of 1995 ("SRA"). At the same time, the Court dismissed the derivative complaint because plaintiffs had failed to make the required demand that the company's board take action. The Court gave plaintiffs leave to amend both complaints; however, plaintiffs chose to amend only the class action complaint.

In their First Amended Complaint ("FAC"), plaintiffs again allege that SGI and the individual defendants[1] violated federal securities law by issuing false and misleading information about the company in an effort to inflate the price of SGI stock for the purpose of selling their own stock at a substantial profit. Plaintiffs have brought this case on behalf of themselves and all persons who purchased SGI stock during the period between September 13, 1995 and December 29, 1995.

## I. Plaintiffs' Allegations

The following section is based on plaintiffs' allegations, which are taken as true for purposes of the motion to dismiss. During September 1995, SGI executives became concerned that the company would not meet its growth and revenue targets because of production problems with its most important new product, the Indigo2 IMPACT workstation. Out of fear that SGI's sales and stock price would decline if this information became public, defendants agreed to conceal the problems from the public. When revenues and stock prices declined anyway in September and October 1995, defendants de-

---

1. In addition to SGI, plaintiffs name six SGI officers and directors as defendants: Edward R. McCracken, Chairman of the Board and Chief Executive Officer; Forest Baskett, Senior Vice President; Robert K. Burgess, Senior Vice Presi-

dent; Michael Ramsay, Senior Vice President; Teruyasu Sekimoto, Senior Vice President; and William M. Kelly, Senior Vice President, General Counsel, and Secretary.

vised a scheme to boost stock prices to protect the company's interests and their individual stakes.

As a part of their scheme, defendants made material misrepresentations about SGI's growth prospects and general financial condition, and failed to disclose adverse facts about SGI's products, management, and competitors. For example, defendants asserted a high sales volume, when in fact sales where materially below SGI's internal targets. SGI also failed to disclose that it had insufficient component parts to produce the Indigo2 IMPACT workstations required to meet demand, instead maintaining that the shortage of workstations was due to unanticipated heavy demand for the product. Defendants disseminated this false and misleading information to the market through SGI's report to shareholders, numerous press reports, and meetings with securities analysts.

Defendants' efforts to boost stock prices were a success. As a result of the misrepresentations, SGI's stock price rose to $38–3/4. Meanwhile, aided by an SGI one million share stock repurchase plan, defendants cumulatively sold nearly 400,000 shares of their own SGI stock, reaping combined profits of approximately $14 million. After defendants had collected their profits, they announced "disastrous" second quarter results, which sent the stock plummeting to $21–1/8. As a result, plaintiffs and potential class members suffered financial damages. Plaintiffs seek to impose direct liability on defendants for their individual misrepresentations, insider trading, participation in the fraudulent scheme, and under a theory of control person liability.

## II. Defendants' Rebuttal

Defendants contend that SGI has experienced rapid growth in recent years, and continued to grow even during the class period. During the fall of 1995, defendants conducted business as usual, making normal statements to shareholders, the press, and industry analysts about the company's performance and anticipated performance. In hindsight, SGI's forecasts may have been optimistic, but there was no fraud involved.

Defendants argue that plaintiffs have not adequately pled their case under the Private Securities Litigation Reform Act. They point out that the FAC is pled on information and belief, and fails to provide any foundational statement of facts, as required by the Second Circuit law on which the SRA arguably is based. Moreover, they contend that even if the "facts" in the FAC are accepted as true, they do not create a strong inference of fraud. Certain individual defendants also seek summary judgment, because they did not make any allegedly false or misleading statements, and did not trade contemporaneously with plaintiffs.

## DISCUSSION

### I. Legal Standard

#### A. Federal Rule of civil Procedure 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *See North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 581 (9th Cir.1983). Dismissal of an action pursuant to Rule 12(b)(6) is appropriate only where it "'appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *See Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1482 (9th Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must assume all factual allegations to be true and must construe them in the light most favorable to the nonmoving party. *See North Star,* 720 F.2d at 580. Legal conclusions need not be taken as true merely because they are cast in the form of factual allegations, however. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). Further, the Court need not accept as true allegations that contradict facts that have been judicially noticed. *See Employers Ins. v. Musick, Peeler, & Garrett,* 871 F.Supp. 381, 385 (S.D.Cal.1994).

The Court may consider documents outside of the pleadings in support of a Rule

12(b)(6) motion to dismiss if the document is referenced in plaintiff's complaint and the document is "central" to plaintiff's claim. *See Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (9th Cir.1993); *Glenbrook Homeowners Ass'n v. Scottsdale Ins. Co.*, 858 F.Supp. 986, 987 (N.D.Cal.1994). The Court may also take judicial notice of facts records outside the pleadings. *See MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986) (taking judicial notice of public records); *Mack v. South Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986).

### B. Federal Rule of Civil Procedure 9(b)

Allegations of fraud must satisfy the requirements of Rule 9(b) to survive a motion to dismiss. Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The purpose of Rule 9(b) is to prevent the filing of a complaint as a pretext for the discovery of unknown wrongs. *See Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.1985).

▮ To satisfy Rule 9(b), securities class action plaintiffs must allege fraud with enough particularity to give defendants notice of the specific charges against them so that defendants may respond to the charges. *See Kaplan v. Rose*, 49 F.3d 1363, 1369 (9th Cir.1994); *Neubronner v. Milken*, 6 F.3d 666, 671–72 (9th Cir.1993). A complaint satisfies this standard if it "state[s] precisely the time, place, and nature of the misleading statements, misrepresentations, and specific acts of fraud." *Kaplan*, 49 F.3d at 1370; see a *Neubronner*, 6 F.3d at 672.

▮ Rule 9(b) also requires that a plaintiff plead with sufficient particularity attribution of the alleged misrepresentations or omissions to each defendant; the plaintiff is obligated to "distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud." *Erickson v. Kiddie*, 1986 WL 544, *7 (N.D.Cal.1986) (quoting *Bruns v. Ledbetter*, 583 F.Supp. 1050, 1052 (S.D.Cal.1984)); *see also Lubin v. Sybedon Corp.*, 688 F.Supp. 1425, 1443 (N.D.Cal.1988)

(finding plaintiff's " 'dragnet' tactic of indiscriminately grouping all of the individual defendants into one wrongdoing monolith" failed to fulfill requirements of Rule 9(b)).

▮ most fraud actions, the requirements of Rule 9(b) may be "relaxed as to matters peculiarly within the opposing party's knowledge," if the plaintiffs cannot be expected to have personal knowledge of the facts prior to discovery. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir.1987) (citations omitted). In securities actions, however, Congress has provided that "if an allegation . . . is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In so providing, Congress intended to assure that the requirements of Rule 9(b) were met in all securities fraud cases, including those pled on information and belief. *See* H.R.Conf. Rep. No. 104–369, at 41 (1995) ("Conf.Rep.").

### C. Federal Rule of Civil Procedure 56

To withstand a motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue of material fact in dispute. *See* Fed. R.Civ.P. 56(e). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

In opposing summary judgment, plaintiff is not entitled to rely on the allegations of his complaint. He "must produce at least some 'significant probative evidence tending to support the complaint.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253,

290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

The Court does not make credibility determinations with respect to evidence offered, and is required to draw all inferences in the light most favorable to the non-moving party. *See T.W. Elec. Serv., Inc.,* 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). Summary judgment is therefore not appropriate "where contradictory inferences may reasonably be drawn from undisputed evidentiary facts...." *Hollingsworth Solderless Terminal Co. v. Turley,* 622 F.2d 1324, 1335 (9th Cir.1980).

### D. Section 10(b)

■ Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe." 15 U.S.C. § 78j(b). One such rule is Rule 10b–5, which makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5 (1995). To allege securities fraud under Rule 10b–5 successfully, plaintiffs must allege both reliance on a material misstatement and scienter. *See Hanon v. Dataproducts Corp.,* 976 F.2d 497, 506–07 (9th Cir.1992).

■ Plaintiffs may allege reliance using the "fraud on the market" theory. "In the usual claim under Section 10(b), the plaintiff must show individual reliance on a material misstatement. Under the fraud on the market theory, the plaintiff has the benefit of a presumption that he has indirectly relied on the alleged misstatement, by relying on the integrity of the stock price established by the market." *In re Apple Computer Secs. Litig.,* 886 F.2d 1109, 1113–14 (9th Cir.1989). Defendants may respond to a claim of fraud on the market by asserting that the information

allegedly withheld from the market had in fact entered the market. *See Id.* at 1114.

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that " § 10(b) ... prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.... The proscription does not include giving aid to a person who commits a manipulative or deceptive act." *Id.* at 177, 114 S.Ct. at 1448. The Supreme Court therefore found that section 10(b) did not create liability for aiding and abetting the securities violations of others. Such secondary participation is beyond the scope of the statute.

## II. Analysis

### A. The Private Securities Litigation Reform Act of 1995

In December 1995, Congress enacted the Private Securities Litigation Reform Act of 1995 ("SRA"), Pub.L. No. 104–67, which amends the Securities Exchange Acts of 1933, 15 U.S.C. §§ 77a–77bbbb, and 1934, 15 U.S.C. §§ 78a–78*lll.* The SRA applies to private class actions, such as this one, brought pursuant to the Federal Rules of Civil Procedure. *See* 15 U.S.C. § 77z–1(a)(1). The SRA prescribes new procedures and substantive standards for private securities litigation. For purposes of this motion, the most important of these changes is the new law's heightened pleading standard.

#### 1. Retroactivity

Although they neglected to raise the argument in opposing the earlier motion to dismiss, plaintiffs now contend that the Court should not apply the SRA to this case because the effect of doing so would be impermissibly retroactive.

■ determining whether a statute should be applied retroactively, "the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf v. USI Film Products,* 511 U.S. 244, 280, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994). If the statute contains

no express direction from Congress, the Court must determine whether applying the statute to pending cases would have an impermissible retroactive effect; however, if the intended scope of the statute is clear from its text, the Court need look no further. *See Id.* at 280–81, 114 S.Ct. at 1505. Although prospectivity is the default rule, courts must give a statute its intended scope. *See Id.* at 272–74, 114 S.Ct. at 1501.

■ Section 108 of the SRA reads, "[t]he amendments made by this title shall not affect or apply to any private action arising under title I of the Securities Exchange Act of 1934 or title I of the Securities Act of 1933, *commenced before and pending on the date of enactment of this Act.*" P.L. No. 104–67, 109 Stat. 737, 758 (1995). This language makes clear that Congress intended the SRA to apply to all cases filed after its enactment.

Plaintiffs argue that because the applicability clause is silent as to pre-enactment conduct, the Court must perform a retroactivity analysis. In support of their argument, plaintiffs cite a number of cases in which courts considered the retroactivity of laws that were totally silent about applicability. *See, e.g., Alvarez–Machain v. United States,* 96 F.3d 1246, 1252 (9th Cir.1996) (Torture Victim Protection Act); *United States ex rel. Schumer v. Hughes Aircraft Co.,* 63 F.3d 1512, 1517 (9th Cir.1995), *cert. granted in part,* —— U.S. ——, 117 S.Ct. 293, 136 L.Ed.2d 212 (1996) (False Claims Act). These cases are inapposite; Congress set a specific limit on the SRA's applicability in § 108.

The legislative history confirms that Congress intended the SRA to apply to any claim filed after the law's enactment. During the debate on the predecessor bill to the SRA, the House of Representatives considered and rejected an amendment that would have permitted some plaintiffs to sue under existing law for a period of three years after enactment. *See* 141 Cong.Rec. H2831 (Mar. 8, 1995) (introducing the "Dingell Amendment"). Both the proponents and opponents of the proposed amendment appear to have understood that lawsuits filed after securities reform was enacted would be subject to the new law. *See, e.g.,* 141 Cong.Rec. H3834 (Mar. 8, 1995) (statements of Rep. Bryant and Rep. Cox).

Because Congress prescribed the scope of the SRA, and because the legislative history reflects Congress's intent to do so, the Court need not consider whether the Act's is impermissibly retroactive. *See United States v. $814,254.76,* 51 F.3d 207, 209, 212 (9th Cir. 1995). The SRA is appropriately applied to this case.

## 2. Pleading Standard

Prior to enactment of the SRA, the pleading standard for private securities cases was well-established in this Circuit. Plaintiffs were required to plead the allegedly false or misleading statements and why they were false or misleading. *See, e.g., In re GlenFed, Inc. Secs. Litig.,* 42 F.3d 1541, 1547–48 (9th Cir.1994), *cert. denied* 116 S.Ct. 1020 (1996). Plaintiffs were permitted to aver scienter generally. *See. e.g., id.*

In enacting the SRA, Congress adopted a more stringent pleading standard. In addition to requiring plaintiffs to specify the allegedly false or misleading statements and describe how they are false or misleading, 15 U.S.C. § 78u–4(b)(1), the SRA now requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The interpretation of this portion of the standard has been the subject of considerable debate in the courts and in the community at large.

This Court addressed the pleading standard for the first time in its September 25, 1996 order dismissing plaintiffs' complaint with leave to amend. After a comprehensive review of the legislative history of the SRA, the Court found that the strengthened standard requires plaintiffs to plead particularized facts that give rise to a strong inference of knowing misrepresentation on the part of defendants. In briefing the motions now before the Court, plaintiffs and *amicus curiae* the Securities and Exchange Commission ("SEC") have asked the Court to reconsider that finding. After reviewing the arguments and the legal authorities, the Court believes that its original interpretation was correct.

Since the Supreme Court decisions in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976), *Santa Fe Industries v. Green,* 430 U.S. 462, 473, 97 S.Ct. 1292, 1300–01, 51 L.Ed.2d 480 (1977), and *Central Bank v. First Interstate Bank,* 511 U.S. 164, 172–73, 114 S.Ct. 1439, 1446, 128 L.Ed.2d 119 (1994), there has been little question that liability under Section 10(b) requires a finding of intent to deceive, manipulate, or defraud. In those cases, the Supreme Court refused to find Section 10(b) liability based on allegations of negligence or aiding and abetting. Although the Supreme Court has never directly addressed whether Section 10(b) liability may be grounded in recklessness, it has noted that "[i]n certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act." *Hochfelder,* 425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12. This notation is consistent with the holdings in *Hochfelder, Green,* and *Central Bank* in suggesting that only intentional recklessness would support Section 10(b) liability.

Despite the Supreme Court's clear message that Section 10(b) does not reach unintentional conduct, many circuit courts imposed Section 10(b) liability for recklessness—both subjective and objective—prior to enactment of the SRA. *See, e.g., Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568 n. 6 (9th Cir.1990) (reviewing cases from ten circuits). Many courts define reckless conduct as:

> a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it.

*Id.* at 1569 (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977)). This definition appears compatible with the Supreme Court cases. Unfortunately, it is neither universally accepted, nor uniformly applied. See H.R.Rep. No. 104–50, 104th Cong., 1st Sess. 39 (1995); *see also Hoffman v. Estabrook & Co.,* 587 F.2d 509,

516 (1st Cir.1978) (approving definition of recklessness as "carelessness approaching indifference"); *Wells v. Monarch Capital Corp.,* 1996 WL 728125, at * 16 (D.Mass. Oct.22, 1996) (citing *Hoffman* definition as First Circuit standard).

The parties and *amicus* Securities and Exchange Commission agree that the SRA is based in large part on Second Circuit law interpreting Section 10(b). *See* Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint at 8; Memorandum of Points and Authorities in Opposition to the Separately–Moving Defendants' Motion to Dismiss or for Summary Judgment at 20; Brief of the Securities and Exchange Commission, Amicus Curiae, Concerning Defendants' Motion to Dismiss the Amended Complaint at 9. Even within the Second Circuit, however, there is conflicting authority about what constitutes scienter for purposes of Section 10(b).

In the Second Circuit, three lines of cases address the scienter requirement of Section 10(b). Under the *Lanza* line of cases, unqualified allegations of recklessness suffice to establish scienter. *See Lanza v. Drexel & Co.,* 479 F.2d 1277, 1306 (2d Cir.1973) (en banc). The *Rolf* line of cases allows recklessness to support scienter only if the defendant also had a fiduciary duty to the plaintiff. *See Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 44 (2d Cir.), *amended,* 1978 WL 4098 (2d Cir. May 22, 1978). Finally, the more recent *Wechsler* line of cases is the strictest, requiring actual intent or circumstances implying actual intent before finding scienter. *See Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir.1984). Although the most recent cases require a strong inference of fraudulent intent, the *Lanza* and *Rolf* cases have not been expressly overruled. *See, e.g., San Leandro Emergency Medical Plan v. Philip Morris,* 75 F.3d 801, 812–13 (2d Cir.1996); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994); *In re Time Warner Inc. Secs. Litig.,* 9 F.3d 259, 271 (2d Cir.1993).

In enacting the SRA, Congress emphasized the "need to establish uniform and

more stringent pleading requirements to curtail the filing of meritless lawsuits." Conf. Rep. at 41. In its search for the right standard, Congress considered and rejected a number of scienter standards. For example, the original House bill would have imposed liability for unqualified recklessness, see H.R. 1058 (as passed on Mar. 8, 1995) and a Senate amendment would have codified the line of Second Circuit law creating liability for unqualified recklessness. See 141 Cong. Rec. S9170 (June 17, 1995) (introducing the Specter Amendment). Instead, Congress adopted language requiring plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

Although the "strong inference" portion of this standard reflects Second Circuit law, the Conference Committee stopped short of adopting Second Circuit law outright:

> Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard. FN 23/
>
> FN 23/For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness.

Conf.Rep. at 41 & n. 23. In excluding from the SRA's pleading standard language relating to motive, opportunity, or recklessness, Congress appears to have rejected the *Lanza* and *Rolf* lines of cases in favor of the *Wechsler* approach that is more consistent with Supreme Court precedent regarding Section 10(b) scienter.

The Court and the parties have looked for confirmation of this interpretation in the legislative history of the SRA. In its decision on the earlier motion to dismiss, the Court found Congress's override of the President's veto of the SRA persuasive. In his veto message, the President expressed concern

that Congress had made "crystal clear" its intent to raise the pleading standard beyond that of the Second Circuit. The President feared that the proposed standard would limit plaintiffs' ability to bring securities fraud claims. See 141 Cong.Rec. S19,035 (Dec. 21, 1995). Further emphasizing its crystal clear intent to do just that, Congress overrode the President's veto without comment on his veto message.

Plaintiffs counter that the statements of individual legislators suggest that the SRA approves of liability for recklessness. As the Court noted in its earlier opinion, many of the statements cited by plaintiffs were made prior to the President's veto message and the subsequent override, and are therefore irrelevant.[2] Moreover, many of the statements made after the veto·but before the override generally support the Court's interpretation. See. e.g., 141 Cong.Rec. H15,219 (Dec. 20, 1995) (statement of Rep. Lofgren) ("These are very technical issues, and I think the sounder course is to override this veto."); 141 Cong.Rec. S19,149 (Dec. 22, 1995) (statement of Sen. Bradley) ("In fact, the language of the bill does codify the second circuit standard in part—and the statement of managers says so.").[3]

The Court acknowledges that the legislative history of the SRA is not entirely consistent at first glance. Some legislators have insisted that the SRA adopted the Second Circuit standard from the *Lanza* line of cases. See. e.g., 141 Cong.Rec. S17,984 (Dec. 20, 1995) (Sen. Mosely–Braun) (prevailing Senate bill included liability for recklessness). Considered in the context of the Supreme Court's prior rulings on Section 10(b) scienter and the Second Circuit's three lines of cases, however, the apparent inconsistencies are less glaring. Because legislators disagreed about the contours of the Second Circuit standard, they necessarily disagreed about what codifying the standard would mean.

---

**2.** See, e.g., 141 Cong.Rec. H14,040 (Dec. 20, 1995) (Rep. Bliley); 141 Cong.Rec. S17,983 (Dec. 20, 1995) (Sen. Mosely–Braun).

**3.** Indeed, some of the legislators quoted by plaintiffs also made statements that contradict plain-

tiffs' position. See, e.g., 141 Cong.Rec. § 19,071 (Dec. 21, 1995) (Sen. Dodd) (The Specter Amendment was rejected because "it was an effort to get recklessness in, which would have changed the standard from the second circuit.").

In light of the confusion revealed in individual legislators' statements, the Court finds the Conference Committee Report and the ultimate adoption of the Conference's version of the bill even more persuasive. The Supreme Court's jurisprudence on statutory interpretation supports the Court's reliance on these aspects of the legislative history. "[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'" *Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984) (quoting *Zuber v. Allen*, 396 U.S. 168, 186, 90 S.Ct. 314, 324, 24 L.Ed.2d 345 (1969)); *see also Resolution Trust Corp. v. Gallagher*, 10 F.3d 416, 421 (7th Cir.1993) (conference report "is the most persuasive evidence of congressional intent besides the statute itself"); *In re Kelly*, 841 F.2d 908, 912 n. 3 (9th Cir.1988) (Committee reports, not "[s]tray comments by individual legislators," provide the best expression of legislative intent.).

This context also counters plaintiffs' argument that the text and structure of the SRA suggest that Congress did not eliminate motive, opportunity, and subjective recklessness as means of establishing scienter.[4] Although Congress could have avoided the confusion surrounding the SRA pleading standard by defining scienter in § 78u–4(b)(2), further definition may have appeared unnecessary given the Supreme Court precedent and the discussion in the Conference Report. In the Conference Committee's view, the general standard for liability under Section 10(b) remained substantially the same, *see* 15 U.S.C. § 78u–4(g)(1) ("Nothing in this subsection shall be construed to create, affect, or in any manner modify, the standard for liability as-

sociated with any action arising under the securities laws."); however, the standard in some cases changed dramatically, and therefore required clarification. *See, e.g.,* 15 U.S.C. § 78u–5 (forward-looking statements).

▪ Based on the foregoing discussion, the Court finds that in order to state a private securities fraud claim, plaintiffs must create a strong inference of knowing or intentional misconduct. *See Hochfelder,* 425 U.S. at 197, 96 S.Ct. at 1382–83. Knowing or intentional misconduct includes deliberate recklessness, as described in *Hollinger* and alluded to in *Hochfelder.* Motive, opportunity, and non-deliberate recklessness may provide some evidence of intentional wrongdoing, but are not alone sufficient to support scienter unless the totality of the evidence creates a strong inference of fraud.

## B. Evidentiary Motions

Before reaching the merits of defendants' motion to dismiss, the Court must clarify what is included in the record on which the motion is to be decided. Both sides have submitted evidence for the Court's consideration, and both sides have objected to the evidence submitted by their opponents. There are three submissions of special concern to the parties: (1) the declaration of Mr. Patrick J. Coughlin, submitted *in camera* in support of plaintiffs' opposition to the motion to dismiss; (2) the declaration of Ms. Deborah Sparkman, which contains a series of SGI "stop ship" reports, submitted in support of defendants' motion to dismiss; and (3) the declaration of Mr. Lloyd Winawer, which contains defendants' SEC forms, submitted in support of defendants' motion to dismiss.

---

4. As discussed in the Court's ruling on the earlier motion to dismiss, the Court does not find the text and structure of the SRA inconsistent with the Court's interpretation of the pleading standard. For example, plaintiffs refer to the proportionate liability provisions of the SRA, 15 U.S.C. § 78u–4(g), to support their position that liability for non-knowing behavior still exists under the new law. Section 78u–4(g)(2)(A) states, "[a]ny covered person against whom a final judgment is entered in a private action shall be liable for damages jointly and severally only if

the trier of fact specifically determines that such covered person knowingly committed a violation of the securities laws." This provision, however, applies generally to the Securities Exchange Act of 1934, and not just the SRA amendments. *See* § 201(a) (section 201 amends 21D); § 27(b) (section 21D amends "Title I of the Securities Exchange Act of 1934 (78a et seq.)"). Thus, Congress was making the distinction between knowing violators under section 21D of the SRA, and, for example, non-knowing control persons under section 78t of the original Act.

■ The declaration of Mr. Coughlin presents the least difficult question. "Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). There are· some narrow exceptions to this rule. *See, e.g., Venture Assocs. Corp.*, 987 F.2d at 431 (defining the incorporation by reference doctrine); *MGIC Indem. Corp.*, 803 F.2d at 504 (noting courts' ability to take judicial notice). Plaintiffs' submission, which they state includes "portions of [their] investigative file," (Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants, Main Motion to Dismiss at 5),[5] does not fit within any exception known to the Court. Moreover, Ninth Circuit authority makes clear that the Court should not tolerate such *ex parte* submissions, in the interests of justice. *See Guenther v. Commissioner of Internal Revenue*, 889 F.2d 882, 884 (9th Cir.1989). For these reasons, the declaration of Mr. Patrick J. Coughlin is stricken.

The declarations of Ms. Sparkman and Mr. Winawer present more complicated questions. In the earlier motion to dismiss, the Court took judicial notice of the SEC forms contained in Mr. Winawer's declaration, and considered them in evaluating whether defendants' stock trades were unusual or suspicious. Although plaintiffs did not question the authenticity or accuracy of these filings at that time, they now express concern because of nine instances of reporting violations by SGI officers in the early 1990s. Plaintiffs also protest that the SEC forms are hearsay.

A court may take judicial notice of a fact that is not "subject to reasonable dispute in that it is either (1) generally known within the jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). "[A] district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991) (taking judicial notice of offer to purchase and joint proxy statement on which complaint was based) (internal quotation marks and citation omitted).

■ Plaintiffs' challenge to the veracity of the SEC forms submitted by defendants is weak. The evidence proffered shows that nine SGI officers, three of whom are defendants in this action, were required to make corrections to their 1992 SEC forms. Plaintiffs neither present evidence that these are continuing violations, nor that they were serious enough to cast doubt on the filings now before the Court. Plaintiffs' challenge is also disingenuous because plaintiffs rely on the information contained in these filings in pleading their allegations. Paragraph 96 of the complaint states that plaintiffs' allegations are based on, among other things, "a review of SGI's SEC filings." Moreover, paragraph 68, which details defendants' stock sales during the class period, is derived from information contained in these filings. Although plaintiffs referred at oral argument to other sources of this information, these "other sources" rely on the SEC filings for their information as well.

■ Even if the Court cannot properly take judicial notice of defendants' SEC forms, given plaintiffs' reliance on the documents, the Court may consider them under the incorporation by reference doctrine. This doctrine provides that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Assoc.*, 987 F.2d at 431; *see also Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994). If courts were prohibited from considering such documents, "complaints that quoted only selected and misleading portions of [them] could not be dismissed ... even though they would be doomed to failure. Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settle-

---

5. Although the Court initially accepted plaintiffs' submission and authorized the Clerk to file it under seal, the Court has not reviewed its con-

tents. At plaintiffs' discretion, the submission shall be returned to them or kept under seal for appellate purposes.

ments." *See Kramer,* 937 F.2d at 774. Although plaintiffs do not cite to defendants' SEC forms in framing their insider trading allegations, the allegations can be derived only from those publicly-filed documents. Plaintiffs cannot preclude consideration of defendants' SEC forms by artful pleading.

■ Plaintiffs' attempt to exclude the SEC forms as hearsay is disingenuous for the same reason. Having raised questions about defendants' stock sales, based their allegations on defendants' SEC filings, and submitted expert declarations that rely on the SEC forms at issue, plaintiffs can hardly complain when defendants refer to the same information in their defense. *See United States v. Anderson,* 532 F.2d 1218, 1229 (9th Cir.1976) (holding that defendant who introduced hearsay statement waived objection to admission of another part of same statement).[6] For these reasons, the Court denies plaintiffs' motion to strike the declaration of Lloyd Winawer.

■ Defendants invoke the same arguments in defense of Ms. Sparkman's declaration. They argue that because plaintiffs' complaint refers to "stop ship" reports relating to the Indigo2 IMPACT workstation, (FAC ¶ 15(d)), defendants are entitled to produce all the stop ship reports issued during the class period in an effort to prove that the alleged Indigo2 Impact stop ship reports do not exist. This argument stretches the incorporation by reference doctrine too far. Although they are relevant to plaintiffs' allegations, the stop ship reports submitted by defendants are arguably outside the scope of the pleadings and should not be considered in evaluating a Rule 12(b)(6) motion to dismiss.[7]

## C. Motion to Dismiss

### 1. Liability of Individual Defendants

#### a. False and Misleading Statements

■ As discussed above, under *Central Bank,* only primary participants in a section 10(b) violation may be held liable. Thus, with regard to allegedly false and misleading statements, only speakers may properly be held liable. *See Central Bank,* 511 U.S. at 176–78, 114 S.Ct. at 1448. Further, only statements made after the alleged fraud began—that is, during the class period—are actionable. Plaintiffs' complaint identifies defendant McCracken as a primary speaker, and suggests that the other defendants helped develop certain public documents and participated in a conference during which false and misleading statements were made.

■ Under the group pleading doctrine, in drafting a complaint, plaintiffs may rely on a presumption that statements in "prospectuses, registration statements, annual reports, press releases, or other 'group-published information,'" are the collective work of those individuals with direct involvement in the day-to-day affairs of the company. *GlenFed,* 60 F.3d at 593; *Wool,* 818 F.2d at 1440. This presumption is rebuttable, however. *See In re Interactive Network, Inc. Secs. Litig.,* 948 F.Supp. 917, 921–22 (N.D.Cal. 1996). On summary judgment, a defendant may rebut the group pleading presumption by producing evidence that he had no involvement in creating the challenged document. *See In re 3Com Secs. Litig.,* 761 F.Supp. 1411, 1414 (N.D.Cal.1990). Defendants Baskett, Burgess, Ramsay, and Sekimoto have attempted to make such a showing

---

**6.** The forms also may be admissible under the business and/or government records exceptions to the hearsay rule. *See United States v. Bland,* 961 F.2d 123, 127 (9th Cir.1992) (holding that gun shop records kept pursuant to government requirements are admissible business records); *United States v. Central Gulf Lines, Inc.,* 747 F.2d 315, 319 (5th Cir.1984) (holding that shipping reports prepared by private citizen and submitted to the government pursuant to law fell within government records exception to hearsay rule). Alternatively, they may be admissible not to prove the truth of the information contained in them, but to show the lack of scienter on the part

of the defendants. *See Gray v. First Winthrop Corp.,* 82 F.3d 877, 885 n. 10 (9th Cir.1996).

**7.** The argument over the stop ship reports exemplifies the problem with the generalized allegations in plaintiffs' complaint. If plaintiffs had fully described the stop ship report in question, and had indicated the source of their information about it, there would be no need for defendants to attempt to file extraneous documents in an effort to defend themselves. As discussed infra Part C.2.b., the SRA requires more complete disclosures than plaintiffs have made in the FAC.

through their motion for summary judgment and the accompanying declarations.[8]

All four defendants aver that they were not involved in preparing or disseminating any of the class period documents. (Baskett Decl. ¶ 2; Burgess Decl. ¶ 3; Ramsay Decl. ¶ 4; Sekimoto Decl. ¶ 3.) All four defendants also aver that they did not make any of the alleged false and misleading statements of October 19, 1995 and November 2, 1995. Defendant Ramsay was on sabbatical and vacation on those dates, (Ramsay Decl. ¶ 2), and defendant Sekimoto, who resides in Japan, was not present either. (Sekimoto Decl. ¶ 4.) Defendants Baskett and Burgess did not participate in the October 19th conference call, (Baskett Decl. ¶ 3, Burgess Decl. ¶ 4), and although they were present at the November 2nd meeting with analysts, their presentations did not involve financial forecasting, sales, or the Indigo2 IMPACT workstations. (Baskett Decl. ¶ 5, Burgess Decl. ¶ 5.)

 Plaintiffs complain that defendants' motion for summary judgment is procedurally improper given the automatic stay of discovery imposed under the SRA. *See* 15 U.S.C. § 78u–4(b)(3)(B) ("[A]ll discovery and other proceedings shall be stayed during the pendency of any motion to dismiss … "). Because they have not been permitted any discovery thus far, plaintiffs argue, they cannot rebut defendants' evidence. The Federal Rules of Civil Procedure have long provided a solution to this problem. Under Rule 56(f), if a "party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court … may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had.... "

Neither the SRA nor its legislative history suggest that Congress intended to alter summary judgment practice under Rule 56. Indeed, the discovery stay provision provides courts with some discretion to permit necessary discovery in advance of a ruling on dismissal. *See* 15 U.S.C. § 78u–4(b)(3)(B) (granting courts authority to permit discov-

ery if necessary "to preserve evidence or to prevent undue prejudice to" a party). In enacting the discovery stay, Congress intended to limit abusive discovery, or "fishing expeditions," which can impose such high costs on defendants that it is often more economical to settle a defensible case than to litigate it. *See* Conf.Rep. at 37. It cannot have intended to insulate plaintiffs from non-frivolous motions for summary judgment.

The Supreme Court has held that Rule 56(f) adequately protects plaintiffs from being "railroaded" by premature motions for summary judgment. *See Celotex Corp.*, 477 U.S. at 326, 106 S.Ct. at 2554. Indeed, courts have approved resort to Rule 56(f) in cases in which discovery has been stayed by court order. *See. e.g., Greensboro Lumber Co. v. Georgia Power Co.*, 844 F.2d 1538, 1545–46 (11th Cir.1988). The Court does not find the circumstances of this case to be so different as to require a departure from the established law of Rule 56, and plaintiffs have not made that argument.

Plaintiffs did not file a Rule 56(f) affidavit before the hearing on these motions as required by Ninth Circuit law. *See Ashton–Tate Corp. v. Ross*, 916 F.2d 516, 520 (9th Cir.1990). Nor did plaintiffs raise any excuse for that omission during oral argument. The Court concludes that plaintiffs are unable to make the requisite showing of (1) facts establishing a likelihood that controverting evidence may exist as to a material fact; (2) specific reasons why such evidence cannot be presented at this time; and (3) steps or procedures to be used to obtain such evidence. *See* Fed.R.Civ.P. 56(f); *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475–76 (9th Cir.1986). For this reason, the individual defendants' motion for summary judgment is granted.

#### b. Insider Trading

Plaintiffs also allege that, as insiders, defendants had a duty to disclose material negative information prior to selling their stock. In failing to do so, plaintiffs allege that defendants violated federal securities law. The

---

**8.** Defendants McCracken and Kelly do not contest that plaintiffs would state a claim against them for making false and misleading statements

if the Court finds that plaintiffs have pled their allegations with sufficient particularity, and have adequately pled scienter.

Supreme Court acknowledged this type of claim in *Chiarella v. United States,* 445 U.S. 222, 227–30, 100 S.Ct. 1108, 1114–13, 63 L.Ed.2d 348 (1980). Such claims are brought under section 20A of the Securities Exchange Act of 1934, 15 U.S.C. § 78t–1, which expressly provides for private suits against insiders who trade contemporaneously with plaintiffs, and under section 10(b) and Rule 10b–5, which create implied private causes of action for insider trading. *See Neubronner v. Milken,* 6 F.3d 666, 669 & n. 5 (9th Cir. 1993).

 its earlier ruling, the Court noted that plaintiffs cannot state a claim against defendants for insider trading unless they can allege that plaintiffs traded contemporaneously with defendants. This rule assures that only parties who have traded with someone who had an unfair advantage will be able to maintain insider trading claims; those who did not trade contemporaneously could not have suffered a disadvantage from the insider's failure to disclose. Courts agree that a plaintiff's trade must have occurred after the wrongful insider transaction. *See Alfus v. Pyramid Tech. Corp.,* 745 F.Supp. 1511, 1522 (N.D.Cal.1990).

The exact contours of contemporaneous trading have not been defined. *See Neubronner,* 6 F.3d at 670. In establishing the contemporaneousness requirement, however, the Ninth Circuit adopted the Second Circuit's reasoning in a case holding that trades occurring approximately a month apart were not contemporaneous. *See id.* at 669–70. Since *Neubronner,* at least one court in this District has held that plaintiffs must show trades within fourteen days of each other to plead contemporaneousness. *See In re Veri-Fone Secs. Litig.,* 784 F.Supp. 1471, 1489 (N.D.Cal.1992), *aff'd,* 11 F.3d 865 (9th Cir. 1993).

In its earlier ruling, the Court interpreted the requirement even more strictly. Given that stock trades settle within three days, and allowing for the possibility of an intervening three-day weekend, only purchases within six days of insider sales are truly contemporaneous. Once an insider's sale settles, other traders are no longer in the market with that insider and risk no relative disadvantage from that insider's failure to disclose.

In response to the Court's order, plaintiffs have amended their complaint to assert that defendants Burgess and Kelly sold stock contemporaneously with plaintiffs Buck, Donald, and Beke's purchases on November 6, 7, 8, 9, and 10, 1995. Plaintiffs do not allege that defendants Baskett, McCracken, Ramsay, and Sekimoto traded contemporaneously with them. For this reason, plaintiffs' claims of insider trading by Baskett, McCracken, Ramsay, and Sekimoto are dismissed with prejudice.

### c. Fraudulent Scheme

 Plaintiffs argue that all defendants can be held liable under section 10(b) for their "scheme to defraud." The text of section 10(b) prohibits the use of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe." 15 U.S.C. § 78j. Rule 10b–5 uses similar terms, prohibiting the employment of "any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b–5. This prohibition goes beyond the liability for isolated misrepresentations or omissions discussed above. *See Blackie v. Barrack,* 524 F.2d 891, 903 n. 19 (9th Cir.1975) ("Rule 10b–5 liability is not restricted solely to isolated misrepresentations or omissions; it may also be predicated on a 'practice or course of business which operates ... as a fraud.' "). Participants may, for example, be liable for their involvement in a pyramid scheme. *See Webster v. Omnitrition Int'l Inc.,* 79 F.3d 776, 785 & n. 6 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 174, 136 L.Ed.2d 115 (1996).

 The word "manipulative" in section 10(b) has a very narrow meaning. It is a "term of art" that refers to practices intended to mislead investors by artificially inflating market activity, such as wash sales, matched orders, or rigged prices. *See Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 473, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1383–84, 47

L.Ed.2d 668 (1976)). Plaintiffs do not allege manipulation in the FAC.

Plaintiffs allege that when SGI executives recognized the problems the company was encountering in the fall of 1995, defendants pursued a "conspiracy of silence" to prevent any negative information from reaching the marketplace. Plaintiffs contend that, through this conspiracy, defendants propped up SGI stock prices long enough to enable defendants to sell off their shares at high prices. Plaintiffs accuse defendants of affirmatively misleading the public by false and misleading statements and of violating the abstain or disclose doctrine prohibiting insider trading.

■■■] Although plaintiffs need not allege that every defendant participated in every aspect of a fraudulent scheme to state a claim, section 10 liability requires a finding that each individual took some action in furtherance of the scheme. *See Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994) (holding that primary liability may be imposed only on those committing a fraud or assisting in its perpetration). The cases cited by plaintiffs support this proposition. In *Securities & Exchange Comm'n v. First Jersey Secs., Inc.*, for example, the Second Circuit found the president of the company primarily liable under a fraudulent scheme theory because he coordinated the market deception. *See First Jersey*, 101 F.3d 1450, 1471–72 (2d Cir.1996) (finding sole ownership of company and participation in underwriting, pricing, and policy sufficient to create primary liability).

Plaintiffs describe three aspects of the fraudulent scheme allegedly devised by defendants. Two of these—making false statements and insider trades—are discussed above. Aside from the group pleading theory also discussed above, plaintiffs do not allege any other facts that form a basis for holding non-speakers and non-traders primarily liable.

■■■] The third aspect of the scheme alleged by plaintiffs is the "conspiracy of silence" among the defendants. (¶¶ 6, 37–38, 49.) Plaintiffs, however, are unable to cite any *post-Central Bank* cases in which courts have imposed liability for mere silence without trading, participation in making false or misleading statements, or other participation in the scheme.[9] Plaintiffs' effort to describe various schemes are unavailing because plaintiffs fail to explain each individual defendant's participation in them. Plaintiffs' scheme allegations appear to be "no more than a thinly disguised attempt to avoid the impact of the *Central Bank* decision." *Stack v. Lobo*, 903 F.Supp. 1361, 1374 (N.D.Cal. 1995). In accordance with *Central Bank*, the Court finds that each defendant is liable for perpetrating a fraudulent scheme only to the extent that he is also found liable for insider trading or making false or misleading statements or as a control person.

### d. Control Person Liability

Section 20A of the 1934 Act imposes joint and several liability on any "person who,

---

9. The cases cited by plaintiffs hold liable only those defendants who directly participated in the scheme. *See Securities & Exchange Comm'n v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1458–60 (2d Cir.1996) (finding sole ownership of company and participation in underwriting, pricing, and policy sufficient to create primary liability); *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 784, 785 n. 6 (finding primary liability based on participation in pyramid scheme which was fraudulent as a matter of law), *cert. denied*, ⸺ U.S. ⸺, 117 S.Ct. 174, 136 L.Ed.2d 115 (1996); *In re Software Toolworks, Inc. Secs. Litig.*, 50 F.3d 615, 628 n. 3 (9th Cir.) (holding auditor primarily liable due to role in drafting and editing letters to SEC), *cert. denied, Montgomery Secs. v. Dannenberg*, ⸺ U.S. ⸺, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995); *Adam v. Silicon Valley Bancshares*, 884 F.Supp. 1398, 1401 (N.D.Cal. 1995) (finding auditor primarily liable for repre-

senting that proper accounting procedures had been followed in drafting financial statements); *In re ZZZZ Best Secs. Litig.*, 864 F.Supp. 960, 968–72 (C.D.Cal.1994) (holding auditor liable for reviewing public statements). The pre-*Central Bank* cases cited by plaintiffs also require direct involvement. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972) (approving of primary liability of bank employees who made a market in securities despite bank representations that its duty was to individual clients); *Shores v. Sklar*, 647 F.2d 462, 464 n. 2 (5th Cir.1981) (holding defendants liable for their various roles in fraudulent marketing of bonds); *Competitive Assoc., Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811, 814 (2d Cir.1975) (finding primary liability of auditor who certified false financial statements).

directly or indirectly, controls any person liable" for securities fraud under the Act, "unless the controlling person acted in good faith and did not directly or indirectly induce" the violations. The SEC defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (1995).

Plaintiffs need not show day-to-day control of the defendant company in order to establish control person liability. *See O'Sullivan v. Trident Microsystems, Inc.,* [1994–1995 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,116, 98,917 (N.D.Cal.1994); *In re XOMA Corp. Sec. Litig.,* [1991–1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,491, 92,163 (N.D.Cal.1991). Plaintiffs must, however, demonstrate "actual power or influence over" the company. *See Gray v. First Winthrop Corp.,* 776 F.Supp. 504, 510 (N.D.Cal.1991). Following these principles, plaintiffs must assert that the individual defendants had the power to control or influence SGI in order to state a cognizable claim under Section 20(a).

Plaintiffs allege control person liability against defendants McCracken and SGI. Defendants do not dispute this allegation. Plaintiffs therefore may state a claim against defendants McCracken and SGI for control persons' liability to the extent that they state a claim for securities law violations by any other defendant.

### 2. Analysis of Remaining Claims

Prior to enactment of the SRA, the Ninth Circuit required plaintiffs pleading on information and belief to include in the complaint a statement of the facts on which the belief is founded. *See Wool,* 818 F.2d at 1439. In an effort to minimize discovery abuse, *see* Conf. Rep. at 31, and unwarranted fraud claims, *see* Conf.Rep. at 41, Congress strengthened this requirement in the SRA. Under the SRA, if a plaintiff's complaint is based on "information and belief," the plaintiff must "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B). Defendants contend that plaintiffs have failed to meet this standard.

Plaintiffs assert that their complaint is not pled on information and belief; however, the language of plaintiffs' complaint belies this assertion. Paragraph 96 of plaintiffs' complaint reads,

[p]laintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of SGI's SEC filings, securities analysts reports and advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants, and believe that substantial evidentiary support will exist for the allegations set forth in ¶¶ 1, 4–15, 19, 27–43, 46, 49–50, 53, 56, 58–70, 72–82, 84, and 87 after a reasonable opportunity for discovery.

Because the sources set forth in paragraph 96 do not provide plaintiffs with personal knowledge, the complaint must be based on information and belief—that is the only alternative. *See Wool,* 818 F.2d at 1439 (holding that plaintiffs may plead on information and belief if matters are not within their personal knowledge).

The degree of specificity required by the SRA in cases pled on information of belief was the subject of some debate in Congress. Arguing against requirement that plaintiffs state with particularity all facts on which their beliefs are formed, Representative Bryant expressed concern that

at the beginning of the case plaintiff would have to set forth "with specificity all information," they have to give all the information in advance that forms the basis for the allegations of the plaintiff, meaning any whistle-blower within a securities firm involved would have to be uncovered in the pleadings in the very, very beginning.

141 Cong.Rec. H2848 (Mar. 8, 1995). Representative Dingell agreed, noting that "you must literally, in your pleadings, include the names of confidential informants, employees, competitors, Government employees, members of the media, and others who have provided information leading to the filing of the case." 141 Cong.Rec. H2849 (Mar. 8, 1995). Despite these concerns, Congress rejected Rep. Bryant's proposed amendment,

which would have permitted plaintiffs to plead simply facts that support their beliefs. See 141 Cong.Rec. H2848 (Mar. 8, 1995).

Because "Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language," *Immigration & Naturalization Serv. v. Cardoza–Fonseca*, 480 U.S. 421, 442–43, 107 S.Ct. 1207, 1219, 94 L.Ed.2d 434 (1987) (internal quotation marks and citation omitted), the Court concludes that plaintiffs must plead the sort of information described by Reps. Bryant and Dingell to meet the requirements of the SRA as enacted.

### a. False and Misleading Statements

The Court first evaluates whether plaintiffs' complaint meets the lower threshold of Federal Rule of Civil Procedure 9(b) and the SRA's mandate to specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading. Plaintiffs allege eleven false or misleading statements by defendants between September 13, 1995 and December 19, 1995. (FAC ¶¶ 50–60.) The content of these statements included (1) projections of SGI's growth rates, (FAC ¶¶ 51, 54, 55, 57); (2) optimism and assurances about demand for, and supply of, the Indigo2 IMPACT workstation, (FAC ¶¶ 50, 52, 53, 54, 57, 58); and (3) explanations and assurances about SGI's performance, (FAC ¶¶ 54, 57, 59, 60).

■ To meet the requirements of Rule 9(b) and the SRA, the FAC must "state precisely the time, place, and nature of the misleading statements, misrepresentation, and specific acts of fraud." *Kaplan*, 49 F.3d at 1370. The FAC meets this burden with regard to McCracken's statements of September 13, 1995, September 21, 1995, September 22, 1995, October 19, 1995, and November 2, 1995, because it identifies the speaker, the content, the audience, and the dates of the misleading statements. The FAC also meets this burden with respect to statements by SGI in its October 19, 1995 press release, with respect to statements by SGI "executives" in the October 19, 1995 conference call and the November 2, 1995 analyst conference, and with respect to statements in the November 1995 Report to Shareholders, because the complaint gives the defendants sufficient notice. Based on the information pled regarding the time, location, and content of these statements, SGI and its executives can identify who is being charged, and with what. For example, plaintiffs' allegations regarding statements by SGI executives at the analyst conference arise out of presentations given by "a dozen officers, including McCracken, Baskett, Burgess, Stephen Goggiano (Director of Marketing), Ramsey [sic], Oswald, and Sekimoto." (FAC ¶ 57.) Defendants can identify which executives participated in the conference, gave presentations, and what those presentations covered.

In its earlier ruling, the Court held that plaintiffs' claims with respect to statements by SGI executives to Dean Witter on December 15, 1995, (Complaint ¶ 50, FAC ¶ 59), and Smith Barney "in the few days prior to December 19, 1995," (Complaint ¶ 51, FAC ¶ 60), did not meet this burden, because plaintiffs had not alleged with sufficient particularity the speaker, time, or place of these conversations. Because, as described in the original complaint, these statements were not given in an official capacity or in a formal context, they were not as identifiable as other unattributed statements alleged by plaintiffs. In the FAC, plaintiffs clarify that these statements were given by defendant McCracken and company treasurer Thomas J. Oswald. (FAC ¶¶ 59, 60.) The Court finds that this clarification sufficiently particularizes plaintiffs allegations for purposes of Rule 9(b) and the SRA.

In addition to alleging the time, place, and nature of the allegedly false and misleading statements, plaintiffs must explain why the statements were false or misleading when made. *GlenFed*, 42 F.3d at 1549. Plaintiffs allege eight reasons why defendants' statements were false and misleading:

- SGI's North American sales reorganization had been unsuccessful, resulting in diminished sales, below SGI's targets;

- SGI was unable to produce sufficient Indigo2 IMPACT workstations to meet consumer demand or internal growth targets because it was not receiving sufficient components from Toshiba;

- SGI used an "end of component 'acceptance test,'" resulting in a low yield of usable parts; [10]
- SGI failed to qualify Toshiba to provide a sufficient quantity of component parts, resulting in low volume production; [11]
- SGI was having problems ramping up the manufacturing of the R10000 chip for use in the upgraded Indigo2 IMPACT workstations;
- SGI sales in Germany and the United Kingdom were materially below expectations;
- SGI sales in France were much worse than expected; and
- SGI's OEM sales were trending downward.

(¶ 60.) Plaintiffs' belief that defendants' statements were false is based on defendants' announcements in 1996 that the company's poor showing resulted from the combined negative effects of these factors. (¶¶ 63–64.) Plaintiffs allege that these conditions existed during the class period when defendants were making their optimistic statements. (¶¶ 36–40.) Plaintiffs thus meet their burden of demonstrating why the statements were allegedly false and misleading. *See GlenFed*, 42 F.3d at 1548–49 (holding that contemporary condition contrary to defendant's optimistic statements adequately pleads falsity); *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996) (finding that allegations of specific problems undermining defendant's claims suffice to explain how they are false).[12]

] Defendants argue that plaintiffs have failed to establish that all of the alleged omissions are material. The materiality of an omission is a fact-specific determination that should ordinarily be assessed by a jury. *See Fecht*, 70 F.3d at 1080–81. Only if the immateriality of the statement is so obvious that reasonable minds could not differ should the Court resolve this question as a matter of law. *Id.* at 1081.

As the Court held in it's earlier order, defendants' statements, as pled in the original complaint, suggest that the omissions were material. For example, in its July 1995 conference call with analysts, SGI stated that the Indigo2 IMPACT would play a major part in meeting the forty percent growth target. (FAC ¶ 47.) In its October 1995 conference call, SGI assured analysts that it would achieve forty percent growth because, among other things, its European business was strong, its sales force reorganization was successful, and the Indigo2 IMPACT was selling well. (¶ 54.) The Court found that such allegations of internal, production, or market conditions resulting in diminished sales or sales under target are not immaterial as a matter of law; those claims, therefore, cannot be dismissed. Plaintiffs' new claims relating to Toshiba's manufacturing difficulties and problems with the R10000 chip fall within this category.

] Plaintiffs also present a new claim about SGI's first quarter shortfall. Plaintiffs have pushed the start of the class period back from October 19, 1995, to September 13, 1995, and now contend that defendants knew of the problems described above early enough that they should have disclosed them prior to announcing the first quarter shortfall in October. Plaintiffs concede, however, that SGI's first quarter results were "at the low end of expectations." (FAC ¶ 8.) The compa-

---

10. These claims are distinguishable from the ones dismissed by the Ninth Circuit in *In re Syntex Corp. Secs. Litig.*, 95 F.3d 922 (9th Cir. 1996). Syntex was merely making optimistic statements about the potential success of new products, *Syntex*, 95 F.3d at 932, whereas SGI is alleged to have withheld information about continuing operations in the United States and abroad.

11. The Toshiba allegations are also distinguishable from the allegations dismissed by the Ninth Circuit in *In re Syntex Corp*. The inadequate testing claim in Syntex was dismissed because Syntex was making its prediction two years in advance, leaving ample time for the company to remedy any problems. *Syntex*, 95 F.3d at 930–31.

12. This finding does *not* establish that defendants' conduct was fraudulent. *See GlenFed*, 42 F.3d at 1549. Plaintiffs must also plead sufficient facts to create a strong inference that defendants knew the falsity of their statements when they gave them. Plaintiffs' allegations of fraudulent intent are analyzed below.

ny's first quarter revenues of $595 million were only five percent below market expectations of forty to forty-five percent growth (revenues in the range of $628–650 million). This shortfall is immaterial as a matter of law. *See In re Convergent Techs. Secs. Litig.,* 948 F.2d 507, 514 (9th Cir.1991) (holding that revenues ten percent below target are not actionable). For this reason, plaintiffs claims regarding the first quarter are dismissed with prejudice.

Having concluded that plaintiffs' claims generally meet the preliminary standard set by Federal Rule of Civil Procedure 9(b) and the SRA, the Court must determine whether plaintiffs have pled with particularity all facts on which their beliefs about the falsity of defendants statements are formed. At this point in the analysis, the line between pleading falsity and pleading fraud becomes blurred. As defendants note, in the Second Circuit, the information and belief pleading requirement appears to be an integral part of the strong inference standard for pleading scienter. *See Philip Morris,* 75 F.3d at 812–813 (finding that plaintiffs' allegations of negative internal reports failed to support claims of falsity and scienter); *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172–73 (2d Cir.1990) (holding that conclusory allegation of leak of confidential information without more failed to create inference of fraudulent intent); *Crystal v. Foy,* 562 F.Supp. 422, 424–25 (S.D.N.Y.1983) (rejecting general allegations of fraud). Because plaintiffs' claims regarding the negative internal reports are also central to their allegations of scienter, the Court further analyzes this issue below.

#### b. Scienter

■ To adequately plead scienter under SRA, plaintiffs must establish a strong inference of knowing or intentional misconduct. In doing so, plaintiffs must do more than speculate as to defendants' motives or make conclusory allegations of scienter; plaintiffs must allege specific facts. *See Wexner,* 902 F.2d at 172–73; *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978). In this case, plaintiffs seek to couple allegations of defendants' awareness of negative internal reports with their false and misleading statements and stock sales to create a strong inference of fraud.

In dismissing plaintiffs' original complaint, the Court found that plaintiffs' general allegations of "negative internal reports" were too vague to raise a strong inference of fraud. Because every sophisticated corporation uses some kind of internal reporting system reflecting earlier forecasts, allowing plaintiffs to go forward with a case based on general allegations of "negative internal reports" would expose all those companies to securities litigation whenever their stock prices dropped.

The Second Circuit has recognized this problem, holding that unsupported general claims of the existence of internal reports are insufficient to survive a motion to dismiss. The Second Circuit requires plaintiffs to identify alleged internal reports specifically, providing names and dates. *See Philip Morris,* 75 F.3d at 812–13. The Court adopted this rule, believing that because the pleading standard under the SRA is at least as strict as the Second Circuit's, the Court could not require anything less of plaintiffs. The Court's finding is further supported by Congress's adoption of the strict information and belief standard described above.

In the FAC, plaintiffs have attempted to bolster their internal reports allegations. Plaintiffs describe a series of reports, including a "Fiscal Year 1996 Plan/Budget," (FAC ¶¶ 32–33), and monthly financial reports such as "Flash" reports, (FAC 35), "Stop Ship" reports, (FAC ¶ 37), and follow-up reports. (FAC ¶ 37).

According to plaintiffs, the Fiscal Year 1996 Plan/Budget was completed in the spring of 1995, and detailed the corporation's projected operations and financials by product line and geographical area. (FAC ¶ 32–35.) The plan allegedly discussed all of the areas that plaintiffs claim eventually became problems for SGI. *Id.* Plaintiffs contend that all defendants received regular daily and monthly reports about the company's performance, covering finances, orders, shipments, and inventories. (FAC ¶ 34.) In addition to these reports, plaintiffs allege that defendants received flash reports regarding SGI's sales and Indigo2 IMPACT problems in ear-

ly October, November, and December 1995, (FAC ¶ 36, 39–40), and a stop ship report further explaining the Indigo2 IMPACT problem in late September. (FAC ¶¶ 37–38.) Subsequently, SGI employees allegedly advised defendants of the steps they were taking to remedy the Indigo2 IMPACT problem via another report. (FAC ¶ 37.)

Although these allegations are more elaborate than the ones dismissed in September 1996, they remain too generic to create a strong inference of fraud under the SRA. As defendants point out, any well-managed, billion dollar company with international operations and multiple products will generate a variety of reports at regular time intervals. Consequently, any company that has announced low earnings would be vulnerable to allegations that such reports exist and that they show "very poor" results "well below forecasted and budgeted levels." *See* FAC ¶¶ 39–40. Indeed, the Second Circuit rejected more specific allegations—that confidential company sales reports showed that retail sales were declining at a rate of 8.3 percent—finding them insufficient to create a strong inference of fraud because they appeared to have been cobbled together in hindsight. *See Philip Morris,* 75 F.3d at 813.

[██] To establish a strong inference of fraud, plaintiffs must provide more details about the alleged negative internal reports. The allegations should include the titles of the reports, when they were prepared, who prepared them, to whom they were directed, their content, and the sources from which plaintiffs obtained this information. *See Id.; Moll v. U.S. Life Title Ins., Co. of N.Y.,* 654 F.Supp. 1012, 1034–35 (S.D.N.Y.1987); *Morgan v. Prudential Group, Inc.,* 81 F.R.D. 418, 423–24 (S.D.N.Y.1979); *Decker v. Massey–Ferguson, Ltd.,* 534 F.Supp. 873, 878 (S.D.N.Y.1981), *aff'd in part, rev'd on other grounds,* 681 F.2d 111 (2d Cir.1982). This requirement is consistent with the SRA's information and belief standard, which requires plaintiffs to plead all facts on which their allegations are based.

Although plaintiffs have complied with the letter of the standard—alleging, for example, that all defendants received a "flash" report generated by the finance department on October 3–4, 1996, showing that sales were below forecasted levels—their allegations fail to conform to the spirit of the standard. If the Court allowed plaintiffs to go forward with such general allegations, the strengthened standard of the SRA would lose its meaning. Plaintiffs' *in camera* submission to the Court, which the Court has declined to review, suggests that plaintiffs may possess sources or specific facts that would improve their allegations about the negative internal reports. In the interest of justice, the Court will allow plaintiffs to supplement these allegations one time further. Plaintiffs are cautioned, however, that the Court expects any supplement to include all facts that form the basis of plaintiffs' allegations, as required by the SRA information and belief standard.

Plaintiffs also rely on defendants' stock sales in attempting to create a strong inference of fraud. All six defendants sold stock during the class period. (FAC ¶ 68.) Defendant Burgess sold 250,588 shares for a total of $8,781,294; defendant Ramsay sold 20,000 shares for a total of $746,071; defendant McCracken sold 60,000 shares for a total of $2,186,000; defendant Sekimoto sold 7,600 shares for a total of $266,988; defendant Baskett sold 30,000 shares for a total of $1,097,500; and defendant Kelly sold 20,000 shares for a total of $743,200. (FAC ¶ 68.) Defendants made their sales in the twenty-three trading days between October 30, 1995 and November 30, 1995. (FAC ¶ 13.)

In evaluating defendants' scienter, the SRA requires the Court to consider each defendant's sales separately. *See* 15 U.S.C. § 78u–4(b)(2). Defendants' stock trading will not support a strong inference of fraud unless the sales are unusual or suspicious. *See Acito,* 47 F.3d at 54. In the Ninth Circuit, courts typically have not considered the amount and timing of stock sales on a motion to dismiss, *see, e.g., In re Worlds of Wonder Secs. Litig.,* 35 F.3d 1407, 1427 (9th Cir.1994); *In re Apple Computer Secs. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989); however, under the strong inference standard, courts in the Second Circuit do consider this information. *See, e.g., Acito,* 47 F.3d at 54.

In dismissing the original complaint, the Court noted that defendants' SEC Forms 3 and 4, and SGI's 1995 proxy statement, show that defendants sold only a fraction of their total SGI holdings. Defendants collectively had available millions of options that could have been exercised and sold during the class period.[13] Considered in that context, defendants' actual sales were relatively small. The sales at issue also appeared generally consistent in amount with sales made in previous quarters. In its earlier ruling, however, the Court declined to examine each individual defendant's trading because it had already found that plaintiffs' allegations of negative internal reports were insufficient. The Court now conducts the required individual analyses.

■■■] Defendant McCracken, who sold 60,000 shares, had 2,305,382 shares and options available during the class period. His sales constituted sixteen percent of his stock holdings, and 2.6% of his available stock and options. Since 1994, defendant McCracken has frequently sold 30–50,000 shares of stock at a time. For these reasons, defendant McCracken's sales do not raise a strong inference of fraudulent intent, as a matter of law. See Acito, 47 F.3d at 54 (finding sales representing less than eleven percent of holdings unsuspicious).

Defendants Baskett's, Ramsay's, and Sekimoto's sales are similarly unsuspicious. Defendant Baskett, who sold 30,000 shares, had 390,577 shares and options available during the class period. His sales constituted 7.7% of his available stocks and options. Since 1994, he has frequently sold 25–60,000 shares of stock at a time. Defendant Ramsay, who sold 20,000 shares, had 489,978 shares and options available during the class period. His sales constituted 4.1% of his available stocks and options. Since 1994, he has frequently sold 10–40,000 shares of stock at a time. Defendant Sekimoto, who sold 7,600 shares, had 110,811 shares and options available during the class period. His sales constituted 6.9% of his available stocks and op-

tions. During the previous two quarters, which represent the extent of his trading history, defendant Sekimoto sold 4,800 shares and no shares respectively.

■■■] Defendants Kelly's and Burgess's sales are less easily explained. Defendant Kelly, who sold 20,000 shares, had 45,790 shares and options available during the class period. His sales constituted 43.6% of his available stocks and options. Defendant Burgess, who sold 250,588 shares, had 332,746 shares and options available during the class period. His sales constituted 75.3% of his available stocks and options.

Because these sales represent such a high percentage of each defendant's holdings, the Court cannot say that they are unactionable as a matter of law. Moreover, neither defendant has a significant trading history to which the Court can compare his class period sales. Defendants Kelly and Burgess raise a number of plausible explanations for the apparent unusual and suspicious nature of their trading; however, these explanations are not properly before the Court on a motion to dismiss. For these reasons, the Court finds that defendants Burgess's and Kelly's stock sales, while not alone sufficient to raise a strong inference of fraud, may be considered as evidence of fraud if plaintiffs are able to buttress their claims regarding negative internal reports.

## CONCLUSION

For the foregoing reasons, the following claims are DISMISSED WITH PREJUDICE: (1) plaintiffs' claims of false and misleading statements relating to the first quarter; (2) plaintiffs' claims of insider trading against defendants McCracken, Baskett, Ramsay, and Sekimoto; and (3) plaintiffs' claims relating to the alleged fraudulent scheme against those defendants not also directly liable for making false or misleading statements or for insider trading.

13. As the Court noted in its earlier order, it is important to consider available options in evaluating stock sales. Exercisable options, not actual stock holdings, represent the owner's trading potential; by limiting their allegations to stock shares, plaintiffs artificially inflate defendants' activities. The differences between vested options and stock shares noted by plaintiffs—transfer and voting rights and dividends—are irrelevant for purposes of this analysis.

The individual defendants' (Baskett, Burgess, Ramsay, and Sekimoto) motion for partial summary judgment on plaintiffs' false and misleading statement claims is GRANTED.

Plaintiffs' remaining claims against defendants shall remain under submission. Plaintiffs may file a supplement to strengthen the allegations of negative internal reports not to exceed *five (5) pages* within *ten (10) days* of this order. Defendants may file a supplemental brief of *five (5) pages* within *ten (10) days* of plaintiffs' submission. Plaintiffs are ORDERED to refrain from making additional legal argument in their submission.

The Court will issue a ruling on plaintiffs' motion for certification of its decision for interlocutory appeal at the same time that it issues an order regarding the claims that it has given plaintiffs leave to supplement.

SO ORDERED.