Hiram and Ruth STURM, as Joint Tenants, on their own behalf, on behalf of all others similarly situated and derivatively on behalf of the Nominal Defendant, Plaintiffs,

v.

MARRIOTT MARQUIS CORP., Host Marriott Corporation, Bruce F. Stemerman, Robert E. Parsons and Christopher G. Townsend, Defendants,

and

Atlanta Marriott Marquis Limited Partnership, Nominal Defendant.

No. Civ.A. 1:97–CV–3706–TWT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Nov. 16, 1998.

Robert J. Abrams, Office of Robert J. Abrams, Atlanta, GA, Lawrence P. Kolker, phv, Robert Abrams, Wolf Haldenstein Adler Freeman & Herz, New York City, NY, Martin D. Chitwood, Cheryl L. Jenkins, Chitwood & Harley, Atlanta, GA, for Hiram Sturm, Ruth Sturm.

George Conley Ingram, Todd Richard David, Teresa Thebaut Bonder, Alston & Bird, Atlanta, GA, Tom Alan Cunningham,

phv, Debbie Darlow, phv, Cunningham Darlow Zook & Chapoton, Houston, TX, for Marriott Marquis Corporation, Host Marriott Corporation, Bruce F. Stemerman, Robert E. Parsons, Christopher G. Townsend, Atlanta Marriott Marquis Limited Partnership.

## ORDER

THRASH, District Judge.

This case is before the Court on Defendants' Motion to Dismiss [12–1] and the Individual Defendants' Motion to Dismiss for Lack of Personal Jurisdiction [13–1]. For the reasons set forth below, the Defendants' Motion to Dismiss is granted as to the Plaintiffs federal securities law claims and denied as to the Plaintiffs' state law claim for breach of fiduciary duty. The Individual Defendants' Motion to Dismiss is denied.

## I. FACTS

The Atlanta Marriott Marquis Hotel is a 1,671 room full service luxury hotel located in Atlanta, Georgia. The Hotel is located on about 3.6 acres of land in downtown Atlanta. The Ivy Street Hotel Limited Partnership developed and owns the Hotel. Defendant Host Marriott Corporation is a Delaware corporation and is one of the largest owners of lodging properties in the world. Marriott International Corporation manages hotels. It has a contract with Ivy Street Hotel Limited Partnership to manage the Hotel. Prior to 1995, Marriott International Corporation and Host Marriott were subsidiaries of the same corporate parent.

In the late 1980s, Marriott sponsored a number of Limited Partnerships which were formed to acquire, own and operate certain hotel properties. The Atlanta Marriott Marquis Limited Partnership [hereinafter "Original Limited Partnership"] was created in 1985 for the purpose of acquiring an 80% interest in the Ivy Street Hotel Limited Partnership. In 1985, the Original Limited Partnership purchased the land on which the hotel sits, and leased it to the Ivy Street Hotel Limited Partnership under a long term lease.

The Original Limited Partnership sold 530 Class A partnership interests for $100,000 each [hereinafter "Class A Units"] to 720 Limited Partners. The Plaintiffs bought one unit. The Limited Partners of the Original Limited Partnership owned 99% of the Class A Units. In addition, the Original Limited Partnership issued Class B partnership interests with no value. Prior to investing in the Original Limited Partnership each Limited Partner certified that he or she was a sophisticated investor. Defendant Marriott Marquis Corporation [hereinafter the "General Partner"] is a subsidiary of Defendant Host Marriott and was the General Partner of the Original Limited Partnership. The General Partner owned 1% of the Class A Units and 100% of the Class B Units. Defendants Bruce E. Stemerman, Robert E. Parsons, Jr., and Christopher G. Townsend [hereinafter the "Individual Defendants"] are all members of the General Partner's Board of Directors and are all officers of Defendant Host Marriott. Defendants Stemerman and Townsend are also the President and Vice-President of the General Partner, respectively.

For a variety of reasons, the hotel and the Original Limited Partnership did not perform as anticipated. Although the investment benefitted the Limited Partners with certain tax losses, cash distributions were less than hoped for and came primarily from the land lease rather than from positive cash flow from hotel operations. Hotel operations improved in the 1990s. However, by this time the Hotel needed comprehensive renovations. In addition, the Hotel's $217 million mortgage debt was due in July, 1997. The maturity date was extended to February 2, 1998. The Defendants undertook extensive efforts to locate funds for renovations and to refinance the mortgage debt.

The Atlanta Marriott Marquis Limited Partnership II [hereinafter the "New Limited Partnership"] is a Delaware Limited Partnership created in 1997. Defendant Marriott Marquis Corporation is the General Partner of the New Limited Partnership. In November of 1997, the General Partner mailed a Consent Solicitation and Prospectus [hereinafter the "Solicitation"] to the Limited Partners of the Original Limited Partnership. The Solicitation sought approval to merge the Original Limited Partnership into the New Limited Partnership. The proposed

merger would result in a one for one exchange of all Class A Units of the Original Limited Partnership for Class A Units of the New Limited Partnership. As a result, the Limited Partners would continue to hold 99% of all Class A Units and the General Partner would hold 1%.

The purpose of the merger, as stated in the Solicitation, was to facilitate the refinancing of the existing mortgage on the hotel and avert foreclosure or a forced sale of the Hotel. In the Solicitation, the Limited Partners were informed of (1) the rationale for the restructuring; (2) the numerous risk factors, including the conflicts of interest and the probability of significantly reduced cash distributions to the Limited Partners; (3) the details of the transactions and restated agreements; and (4) the potential results of either a positive or negative vote by the Limited Partners. In connection with the restructuring, Marriott proposed to contribute an additional $75 million in equity. The General Partner proposed the merger because it did not believe that enough Limited Partners would agree with the restructuring of the Limited Partnership as desired by the General Partner to allow the amendment of the Original Limited Partnership Agreement. A majority of the holders of Class A Units approved the merger as set forth in the Solicitation. The proposed merger was closed and the Original Limited Partnership no longer exists.

The New Limited Partnership is governed by a partnership agreement that is substantially different from that of the Original Limited Partnership. Under the Original Limited Partnership Agreement the rental payments received by the Limited Partnership were automatically distributed to the holders of Class A Units. These payments have accounted for 92% of all distributions actually made to the Limited Partners. In 1994, 1995, and 1996, these payments were $1,869,000, $2,526,000, and $2,806,000, respectively. Under the Original Limited Partnership Agreement, Ivy Street had an option to purchase the land from the Limited Partnership at a set price. As a result of the restructuring, the Limited Partnership conveyed the land to Ivy Street in exchange for a capital credit equal to the exercise price of Ivy Street's option. Following the restructuring, Ivy Street Limited Partnership no longer makes rental payments to the Limited Partnership. Instead of rent payments, the New Limited Partnership is entitled to a 10% compounding preferred return in its Ivy Street capital account. In reality, this means that the Limited Partners get an accounting entry in the capital account that may never result in an actual distribution of funds.

Under the Original Limited Partnership Agreement, holders of Class A Units were entitled to a 10% priority return on their investment. Under the New Limited Partnership Agreement, that is reduced to a subordinated 5% return that is paid at the sole discretion of the General Partner. Under the Original Limited Partnership Agreement holders of Class B Units were not entitled to any priority returns. Under the New Limited Partnership Agreement the Holders of Class B units are entitled to a 13.5% preferred, cumulative, compounded return. The restructuring converted Defendant Host's 20–year non-interest-bearing loan to Ivy Street into a 15–year loan with a 9% interest rate for the first five years. Furthermore, repayment of this loan is prioritized over payments to the New Limited Partnership. Therefore, the cash flow from the Hotel that previously went first to holders of Class A Units (by way of rents under the Original Limited Partnership distribution scheme) now first goes to repay Defendant Host's new interest bearing loan and then to the holders of Class B Units. In addition, as part of the restructuring, Defendant Host was released from its guarantee of up to $50 million on the original mortgage. All of these changes in the rights of the Limited Partners were disclosed in the Solicitation.

Under the Original Limited Partnership Agreement neither the General Partner nor its affiliates were allowed to vote its Units. Under the New Limited Partnership Agreement, the General Partner and its affiliates have the same voting rights as other holders of Class A Units. Under the Original Limited Partnership Agreement a majority of the holders of Class A Units had to consent before the General Partner could sell the Hotel or the land. Under the New Limited

Partnership Agreement, the General Partner can sell the Hotel without the consent of any of the holders of Class A Units as long as the buyer is not an affiliate of the General Partner. Under the Original Limited Partnership Agreement, the General Partner could not amend any agreement between the partnership and the General Partner or its affiliates without the consent of a majority of the holders of Class A Units. Furthermore, the General Partner could not increase its or its affiliates' compensation under the agreement. Under the New Limited Partnership Agreement, the General Partner can amend the Agreement without the consent of the Limited Partners to increase it or its affiliates' compensation as long as it does not exceed the market rate.

Under the New Limited Partnership Agreement, a vote of two-thirds of the holders of Class A Units is required to remove the General Partner. Under the Original Limited Partnership amendments to the Agreement required a majority or unanimity of the holders of Class A Units. Under the New Limited Partnership Agreement, amendments to the Agreement require a majority or unanimity of the holders of Class A Units except where the General Partner considers it necessary to "clarify" the agreement. No consent by the Limited Partners is required as long as the clarification does not materially affect the Limited Partners. All of these changes in the Partnership Agreement were disclosed in the Solicitation.

On December 12, 1997, the merger of the Original Limited Partnership into the New Limited Partnership was approved by a majority of the Limited Partners. By the end of December, the merger was closed. The Plaintiffs filed this action prior to the closing of the merger. They contend that the merger was unfair to the Limited Partners because no independent entity represented the interests of the Limited Partners in the reorganization and restructuring of the Limited Partnership; there was no appraisal of the Hotel; there were no arms-length negotiations on behalf of the Limited Partners; alternatives to the restructuring were not explored; and the terms of the restructuring benefitted the General Partner and the other Marriott entities to the unfair detriment of the Limited Partners. The Defendants contend that the restructuring was necessary to prevent foreclosure or a forced sale of the Hotel, and that the terms of the merger and its financial consequences to the Limited Partners was fully and completely disclosed in the Solicitation.

## II. MOTION TO DISMISS STANDARDS

In considering a motion to dismiss, the Court must accept the allegations in the plaintiff's complaint as true and must construe those allegations in the light most favorable to the plaintiff. *Bank v. Pitt,* 928 F.2d 1108, 1109 (11th Cir.1991). Furthermore, the Court should ignore any allegations which contain no more than opinions or legal conclusions. *South Florida Water Management Dist. v. Montalvo,* 84 F.3d 402, 409 n. 10 (11th Cir.1996). The Court may grant a defendant's motion to dismiss only if it appears beyond doubt that the plaintiff can prove no set of facts which would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Milburn v. United States,* 734 F.2d 762, 765 (11th Cir.1984).

## III. THE DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### A. PLAINTIFFS' SECTION 10(B) AND RULE 10(B)–5 EXCHANGE ACT CLAIMS

In Count I of the Complaint, the Plaintiffs contend that the Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) [hereinafter "Section 10(b)"], and 17 C.F.R. § 240.10b–5 [hereinafter "Rule 10(b)–5"] by making false statements and concealing material facts in connection with the restructuring of the Limited Partnership. Section 10(b) of the Exchange Act makes it unlawful for any person to use, in connection with the sale of any security, any deceptive device in contravention of such rules and regulations as the S.E.C. may prescribe. 15 U.S.C. § 78j(b). Rule 10(b)–5 prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements misleading. 17 C.F.R. § 240.10b–5. To state a claim under Rule 10(b)–5, a plaintiff must allege

that the defendant (a) made a misstatement or omission, (b) of material fact, (c) with scienter, (d) in connection with the purchase or sale of securities, (e) upon which the plaintiff relied, and (f) that reliance proximately caused the plaintiff's injury. *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir.1997); *Bruschi v. Brown*, 876 F.2d 1526, 1528 (11th Cir.1989); *Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1469 (N.D.Ga. 1997). It is undisputed that the Limited Partners relied on the Solicitation in approving the merger.

 A Rule 10(b)–5 claim must state the circumstances constituting fraud with sufficient particularity to satisfy the requirements of Federal Rule of Civil Procedure 9(b). *Gross* 977 F.Supp. at 1470. A fraud claim meets the requirements of Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral presentations, who made the statements, the time and place of the statements, the contents of the statements or manner in which they misled the plaintiff, and what the defendants gained as a consequence. *Brooks v. Blue Cross and Blue Shield of Florida*, 116 F.3d 1364, 1371 (11th Cir.1997).

Recently, Congress passed the Private Securities Litigation Reform Act of 1995 ("Reform Act"), Pub.L. No. 104–67, 109 Stat. 743 (codified at 15 U.S.C. § 78u–4(b)). The Reform Act requires a securities-fraud plaintiff to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). If an allegation regarding a statement or omission is made on information and belief, the complaint must state with particularity the facts on which the belief is formed. *Id.* Further, as to each statement or omission, plaintiffs must set forth particular facts that give rise to a strong inference that the defendants acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2). A complaint that fails to comply with any of these requirements must be dismissed. 15 U.S.C. § 78u–4(b)(3)(A).

 In considering a motion to dismiss, the Court may not normally rely on evidence outside of the pleadings. However, it may do so where the documents are undisputedly authentic and were specifically relied on in the plaintiff's complaint. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 n. 9 (8th Cir. 1997); *In re Donald J. Trump Casino Securities Litigation–Taj Mahal Litigation*, 7 F.3d 357, 368 n. 9 (3rd Cir.1993), *cert. denied Gollomp v. Trump*, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). The parties have both submitted copies of the Solicitation for the Merger and the Plaintiffs heavily rely on this document in their Complaint. At oral argument, counsel for the Plaintiffs specifically agreed that the Court should consider the Solicitation in ruling on the Motions to Dismiss. Therefore, the Court will consider this document in analyzing the Defendants' Motion to Dismiss for failure to state a claim.

### 1. FALSE STATEMENTS OR OMISSIONS

 The Plaintiffs contend that the Solicitation contains materially false and misleading statements upon which the Limited Partners relied in approving the merger. First, the Plaintiffs contend that the Defendants failed to disclose that the fair market value of the land and the hotel exceeded $300 million. The Solicitation stated that the Defendants' advisor had concluded that the property was worth $250–255 million. The Plaintiffs also contend that obtaining an independent appraisal was not prohibitively expensive as stated in the Solicitation. The Plaintiffs' allegations concerning failure to disclose the true value of the hotel satisfy the particularity requirements of Rule 9(b). They also specify the statement alleged to have been misleading and the reason why the statement was misleading as required by the Reform Act.

 The Plaintiffs also contend that the General Partner failed to disclose that "given the Hotel's current performance, and considering any reasonable projection of the future performance, the Limited Partners will receive no distributions for at least the next several years, and that the General Partner's accumulation of its preferred return will continue to erode their equity. . . ." This allegation satisfies the particularity requirement of Rule 9(b) and the specificity requirement of the Reform Act. The Plaintiffs also claim that the Defendants failed to disclose that the

resale value of the Class A units would be diminished or eliminated. This allegation satisfies the particularity requirement of Rule 9(b) and the specificity requirement of the Reform Act.

■ In the Complaint, Plaintiffs allege that the General Partner and its parent corporation "are taking the equity, value and profits of the Hotel from the Limited Partners and giving it to themselves." Complaint, Par. 2. Accepting this allegation as being true, it does not support a cause of action for violation of federal securities laws absent a misrepresentation or manipulative device. In *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court held that Section 10(b) does not authorize a cause of action for internal mismanagement or breach of fiduciary duty by majority shareholders absent any deception, misrepresentation or nondisclosure. Accordingly, the Plaintiffs' claims that the merger was unfair to them do not state a claim for violation of federal securities laws. The only allegations that may be considered are those involving the alleged false representations discussed above.

### 2. MATERIALITY

■ A misleading statement or omission must be material in order to state a claim pursuant to Rule 10b–5. *Basic, Inc. v. Levinson*, 485 U.S. 224, 246–47, 108 S.Ct. 978, 991–92, 99 L.Ed.2d 194 (1988). A false statement or omission will be considered "material" if its disclosure would alter the total mix of facts available to an investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision. *Id.* Materiality is a mixed question of law and fact. *Goldman v. Belden*, 754 F.2d 1059, 1067 (2nd Cir.1985). A complaint may not be dismissed under Rule 12(b)(6) unless the alleged misstatements and omissions are "so obviously unimportant to a reasonable investor that reasonable minds could differ on the question of their importance." *Id.* In this case, the materiality of the alleged false statements and omissions must be judged in the context of the facts and statements of opinion set forth in the Solicitation. The Eleventh Circuit has held:

The context in which a statement is made is important. When an offering document's projections are accompanied by meaningful cautionary statements and specific warnings of the risks involved, that language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law.

*Saltzberg v. TM Sterling/Austin Associates, Ltd.*, 45 F.3d 399, 400 (11th Cir.1995).

■ According to the Solicitation, the General Partner's advisor had valued the Hotel property as being worth $250–255 million. If the property was really worth more than $300 million, that is a fact that would probably be important for an investor to know in considering the alternatives to approval of the proposed merger. Therefore, the failure to disclose the alleged true value of the Hotel property is a material fact. On the other hand, the Solicitation did state that the value of the Class A units might be adversely affected by the merger. In light of this, the alleged failure to disclose that there *might* be no distributions in the next several years and that the resale value of the units *might* be eliminated cannot as a matter of law constitute material misrepresentations.

The absence of an appraisal was disclosed. The risk of significantly reduced distributions to the limited partners was disclosed. The risk of reductions in the equity share of the limited partners was disclosed. The disclosures regarding Arthur Consulting's fairness opinion were not misleading. The fact that the General Partner had not sought a fairness opinion with respect to the fairness of the merger to the limited partners was disclosed. The lack of safeguards for the limited partners' interests was disclosed. The conflicts of interest were disclosed. Given these disclosures, the difference between what is said in the Solicitation and what the Plaintiffs say should have been said (other than the value of the Hotel) would not alter the total mix of facts available to an investor. There is no substantial likelihood that a reasonable shareholder would consider the differences important to the decision of whether or not to approve the merger. The deal may have been unfair, but the Solicitation was not generally misleading.

### 3. SCIENTER

The Plaintiffs must properly allege scienter in order to state a claim pursuant to Section 10(b) and Rule 10(b)-5. The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976). Before the enactment of the Reform Act, the law in the Eleventh Circuit was clear that "a showing of 'severe recklessness' satisfies the scienter requirement." *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989).

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* (*quoting Broad v. Rockwell International Corp.*, 642 F.2d 929, 961 (5th Cir.) (*en banc*), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)). In the Eleventh Circuit, there was no special pleading standard for securities fraud actions.

Prior to the Reform Act, the Second Circuit adopted a special heightened pleading standard for securities fraud cases. It held that "to serve the purposes of Rule 9(b), we require plaintiffs to allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1128 (2nd Cir.1994). However, in some cases, it also held that a plaintiff could satisfy this heightened pleading standard by alleging (1) facts constituting strong circumstantial evidence of reckless or conscious misbehavior, or (2) facts showing that the defendants had both motive and opportunity to commit fraud. *Id.* Arguably, the "motive and opportunity" standard for alleging scienter lowered the bar more than the heightened pleading standard raised it. In practice, the Second Circuit applied the "motive and opportunity" standard in such a way that it is questionable whether there really were two ways of alleging scienter. In other words, without a showing of conduct suffi-

cient to infer fraudulent intent, the Second Circuit always found insufficient showing of motive and opportunity to establish scienter. *See Shields*, 25 F.3d at 1130–31; *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 269–272 (2nd Cir.1993). Thus, in the Second Circuit, there was a heightened-pleading requirement, but, at least in theory, a reduced standard as to the state of mind that must be alleged and proven to establish scienter.

The Reform Act requires that plaintiffs must set forth as to each statement or omission particular facts that give rise to a strong inference that the defendants acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2). The application of the Reform Act's standard has produced considerable debate in the district courts as to whether the Reform Act has adopted all or part of the Second Circuit standards for pleading scienter in securities fraud actions. Since the Reform Act's enactment, several courts have held that the Reform Act's requirements for pleading scienter is consistent with all aspects of the Second Circuit's jurisprudence. *See Fugman v. Aprogenex Inc.*, 961 F.Supp. 1190, 1195 (N.D.Ill.1997); *Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1250–53 (N.D.Ill.1997); *Marksman Partners*, 927 F.Supp. at 1311. In determining that the Reform Act adopts both aspects of the Second Circuit standard, the court in *Rehm* cited a report from the Senate Banking, Housing, and Urban Affairs Committee on the Reform Act's passage which stated:

> The Committee does not adopt a new and untested pleading standard that would generate additional litigation. Instead, the Committee chose a uniform standard modeled upon the pleading standard of the Second Circuit.... The Committee does not intend to codify the Second Circuit's caselaw interpreting this pleading standard, although courts may find this body of law instructive.

*Rehm*, 954 F.Supp. at 1252 (*quoting* S.Rep. 98, 104th Cong., 1st Sess., 15 (1995)).

Conversely, other courts have concluded that Congress intended to strengthen the Second Circuit standard by holding that the "motive and opportunity" prong of the Sec-

ond Circuit's pleading standard no longer suffices to raise a strong inference of scienter. *See In re Silicon Graphics, Inc. Securities Litigation,* 970 F.Supp. 746, 757 (N.D.Ca.1997); *Norwood Venture Corp. v. Converse Inc.,* 959 F.Supp. 205, 208 (S.D.N.Y.1997). The courts in *Silicon Graphics* and *Norwood* noted a House Conference Report which stated that Congress intended to "strengthen the existing pleading requirements" and did "not intend to codify the Second Circuit's case law interpreting this pleading standard." *Silicon Graphics,* 970 F.Supp. at 756; *Norwood,* 959 F.Supp. at 208 (*quoting* H.R.Conf.Rep. No. 104–369, 104th Cong. 1st Sess. 41 (1995)). Moreover, these courts relied upon President Clinton's veto of the Reform Act, a veto that Congress overrode, in which the President stated that it was "crystal clear" that Congress intended the Reform Act to go beyond the Second Circuit standard. *Silicon Graphics,* 970 F.Supp. at 756; *Norwood,* 959 F.Supp. at 208. With regard to the first prong of the old Second Circuit standard, the courts in *Silicon Graphics* and *Norwood* relied on this legislative history in determining that a Plaintiff must show more than strong circumstantial evidence of reckless behavior. *See Silicon Graphics,* 970 F.Supp. at 756–57; *Norwood,* 959 F.Supp. at 208–09; *see also Powers v. Eichen,* 977 F.Supp. 1031, 1038–39 (S.D.Cal.1997). Thus, to establish scienter, these courts hold that the plaintiff must set forth facts that "create a strong inference of knowing or intentional misconduct" on the part of the defendants. *Silicon Graphics,* 970 F.Supp. at 757. The courts in *Norwood* and *Silicon* therefore hold that the Reform Act intended a higher pleading requirement than the Second Circuit by not codifying its motive, opportunity and recklessness standards.

While holding that Congress eliminated the "motive and opportunity" prong under the Reform Act, other courts have held that a plaintiff may still plead facts showing strong circumstantial evidence of reckless behavior. *See In re Stratosphere Securities Litigation,* 1 F.Supp.2d 1096, 1107 (D.Nev. 1998); *Novak v. Kasaks,* 997 F.Supp. 425,

430 (S.D.N.Y.1998); *In re Baesa Securities Litigation,* 969 F.Supp. 238, 240–42 (S.D.N.Y.1997). In *Baesa Securities,* the court focused on the statutory language of § 78u–4(b)(2) which requires plaintiff to set forth as to each statement or omission particular facts that give rise to a strong inference that the defendants acted with the requisite scienter. The court concluded that nothing in this statute eliminated the recklessness aspect of the scienter requirement. *Id.* at 241. While adopting the "strong inference" requirement, the court concluded that the statute neither mentions "motive and opportunity" nor singles out any other special particulars sufficient to show scienter. *Id.* at 242. Because the statutory language is clear, the court concluded that it was neither necessary nor prudent to resort to the Reform Act's convoluted legislative history. *Id.* at 241–42.[1]

The Court is persuaded that the approach of *Baesa Securities* is the proper one. The Reform Act does what it says it does— no more and no less. The Act incorporates the heightened-pleading standard of the Second Circuit in that it requires the plaintiff to set forth particular facts that give rise to a strong inference that the defendant acted with "the required state of mind." 15 U.S.C. § 78u–4(b)(2). However, the Act did nothing to change "the required state of mind" with respect to this type of action. This is consistent with the Conference Committee Report on the Reform Act stating that the Committee strengthened pleading requirements, but "chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness." H.R.Conf.Rep. No. 104–369, 104th Cong. 1st Sess. 41 (1995). It is also consistent with the Joint Explanatory Statement of the Committee of Conference Regarding S.1260, the Securities Litigation Uniform Standards Act of 1998. In that Statement, the Conference Committee stated:

It is the clear understanding of the managers that Congress did not, in adopting the Reform Act, intend to alter the standards

---

1. A fourth set of cases have dodged the issue. *Gross,* 977 F.Supp. at 1472; *In re ValuJet, Inc. Securities Litigation,* 984 F.Supp. 1472 (N.D.Ga.

1997); *In re Miller Industries, Inc. Securities Litigation,* 12 F.Supp.2d 1323 (N.D.Ga.1998). The issue cannot be dodged in this case.

of liability under the Exchange Act. The managers understand, however, that certain Federal district courts have interpreted the Reform Act as having altered the scienter requirement. In that regard, the managers again emphasize that the clear intent in 1995 and our continuing intent in this legislation is that neither the Reform Act or S.1260 in any way alters the scienter standard in Federal securities fraud suits. Additionally, it was the intent of Congress, as was expressly stated during the legislative debate on the Reform Act, and particularly during the debate on overriding the President's veto, that the Reform Act established a heightened uniform Federal standard on pleading requirements based upon the pleading standard applied by the Second Circuit Court of Appeals. Indeed, the express language of the Reform Act itself carefully provides that plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." The Managers emphasize that neither the Reform Act nor S.1260 makes any attempt to define that state of mind.

After careful review of the legislative history of the Reform Act, the Court is convinced that the Second Circuit's two pronged standard of (1) motive and opportunity or (2) conscious misbehavior or recklessness relate to the definition of state of mind, and are neither incorporated in nor repealed by the Reform Act.

■ As noted above, the Eleventh Circuit has clearly defined the state of mind required to establish scienter in a securities fraud action. This Court is bound by Eleventh Circuit precedent and not by the caselaw of the Second Circuit. The Eleventh Circuit has never adopted a scienter standard that follows the "motive and opportunity" analysis of the Second Circuit. A good argument can be made that the "motive and opportunity" standard, if honestly applied, lowers the bar for securities fraud cases below that mandated by the Supreme Court in *Hochfelder*. Greed is a ubiquitous motive, and corporate insiders and upper management always have opportunity to lie and ma-

nipulate. Furthermore, allowing private securities class actions to proceed to discovery upon bare allegations of motive and opportunity would upset the delicate balance of providing a remedy for genuine fraud while preventing abusive strike suits that the Reform Act sought to achieve. Motive and opportunity will ordinarily be relevant, and often highly relevant, to a finding of fraudulent intent. However, the Court concludes that a showing of motive and opportunity alone are insufficient to allege securities fraud under the "severe recklessness" standard established by the Eleventh Circuit.

■ For the same reasons, the Court rejects the argument that the Reform Act requires a showing of intentional misconduct or conscious misbehavior. "[W]here Congress intended to establish knowing conduct as a prerequisite for liability, it did so explicitly within the Reform Act, such as providing a safe harbor for forward looking statements." *Stratosphere Securities*, 1 F.Supp.2d at 1107 (*citing* 15 U.S.C. § 77z–2(c)(1)(B); 15 U.S.C. § 78u–5(c)(1)(B)). These provisions regarding forward-looking statements would be rendered meaningless if actual knowledge were required for all allegedly misleading statements. *Stratosphere Securities*, 1 F.Supp.2d at 1107. Because recklessness is sufficient to prove scienter under the Reform Act unless the statute expressly provides otherwise, the Court concludes that a plaintiff can properly plead scienter by alleging facts constituting strong circumstantial evidence of severe recklessness or conscious misbehavior.[2]

■ With respect to the Section 10(b) and Rule 10(b)-5 claim, the only material misrepresentation is that dealing with the alleged true value of the Hotel property. The Plaintiffs have adequately pled facts showing that the Defendants had motive and opportunity to defraud the Limited Partners. However, for the reasons set forth above, allegations showing motive and opportunity to defraud are not sufficient to state a claim for securities fraud. In Paragraph 88 of the Complaint, the Plaintiffs allege that the true value of the hotel property exceeded $300

---

**2.** The Court has reached the same conclusion in *Carley Capital Group v. Deloitte & Touche*, 1998 WL 804929, Case No. 97–CV–3183–TWT (Order dated November 16, 1998).

million. However, they fail to allege that the General Partner and the Individual Defendants knew this and deliberately or recklessly misrepresented the value of the property in the Solicitation. The Plaintiffs have not alleged facts constituting strong circumstantial evidence of reckless or conscious misbehavior by the Defendants in connection with the statements made in the Solicitation regarding the value of the hotel property. This is particularly true in light of the repeated disclosure of the conflicts of interest between the General Partner and the Limited Partners. Therefore, the heightened pleading standard of the Reform Act is fatal to the Plaintiffs' Rule 10b–5 securities fraud claim. The Plaintiffs fail to state a claim for securities fraud pursuant to the S.E.C.'s roll-up transaction regulations for the reasons discussed below regarding Count III.

### B. SECTION 11 AND 12 SECURITIES ACT CLAIMS

██ In Count II of the Complaint, the Plaintiffs allege violations of Sections 11 and 12 of the Securities Act, 15 U.S.C. §§ 77k, 77l and 77z–2. Sections 11 and 12 of the Securities Act provide buyers with a cause of action against those who sell securities by means of a Registration Statement or a Prospectus when those documents contain material misstatements or omissions. The Supreme Court has stated that Sections 11 and 12 only apply when a document solicits the *public* to acquire securities. *John Nuveen & Co., Inc. v. Sanders,* 450 U.S. 1005, 1008, 101 S.Ct. 1719, 1720, 68 L.Ed.2d 210 (1981) (Section 11); *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 574, 115 S.Ct. 1061, 1069, 131 L.Ed.2d 1 (1995) (Section 12). This case does not involve an initial public offering. The Solicitation was sent only to the Limited Partners of the Original Limited Partnership. Only those Limited Partners were entitled to exchange their partnership interests for partnership interests in the New Limited Partnership. The Plaintiffs have failed to state a claim for which relief can be granted under Sections 11 and 12 of the Securities Act. Therefore, Count II should be dismissed.

### C. THE ROLL–UP REGULATIONS

██ In Count III, the Plaintiffs contend that the Defendants violated the S.E.C.'s regulations regarding roll-up transactions, 17 C.F.R. § 229.901 *et seq.* The regulations impose certain disclosure requirements in transactions involving the combination or reorganization of partnerships in which some or all of the partnership investors will receive securities in another entity. 17 C.F.R. § 229.901(c)(1). The Plaintiffs allege that the Defendants failed to comply with these disclosure requirements. The Defendants argue that the merger was not a roll-up transaction. On its face, the merger of the Original Limited Partnership into the New Limited Partnership appears to be a roll-up transaction. The Defendants' argument to the contrary is not convincing. Assuming without deciding that there is a private right of action for violation of the roll-up regulations, a careful review of the Solicitation leads to the conclusion that the Defendants complied with the S.E.C.'s disclosure requirements for roll-up transactions.

██ In this transaction, the roll-up regulations required the General Partner to state, in detail, the basis for its decision to recommend the merger. 17 C.F.R. § 229.902(b)(3). In stating the basis for its recommendation, the General Partner is not allowed to justify its recommendation with conclusory statements. 17 C.F.R. § 229.902(b)(4). The Plaintiffs claim that the General Partner failed to provide any quantitative data or other analysis supporting its recommendation. However, § 299.902(b)(3) does not require the General Partner to supply quantitative data to support is decision. It merely requires that the General Partner provide a "brief" statement supporting its conclusion. Even the regulatory section that addresses the principal disclosures that a General Partner must make does not require a mathematical analysis of the General Partner's decision. *See* 17 C.F.R. § 229.910. The regulations require that the General Partner disclose the basis for its decision and the Court finds that the General Partner did so in this instance. The General Partner provided a list of the benefits and detriments to the Limited Partners that would result from

the merger. The Solicitation stated that the General Partner's recommendation was based upon the analysis provided by its financial advisor. The Solicitation included a copy of the advisor's written opinion. It included financial statements that the Limited Partners could have used to perform their own analysis if they had chosen to do so. Finally, the Solicitation discussed in detail the factors which led the General Partner to conclude that the merger was necessary and the effect that the merger would have on all of the parties involved. By providing these disclosures the General Partner satisfied its duty under § 229.902(b)(3).

 The roll-up regulations also require the General Partner to disclose any contacts or negotiations concerning a merger. 17 C.F.R. § 229.907(a)(1). The Plaintiffs claim that the General Partner violated this regulation by not disclosing the identity of certain institutional lenders that the General Partner contacted when it was exploring alternatives to the merger. However, 17 C.F.R. § 229.907(a)(1) does not require that the General Partner disclose the identity of those contacted regarding alternatives to the merger. The regulations require disclosure of the identity of those contacted regarding the merger and this was done in the Solicitation. Therefore, the Court finds that the General Partner did not violate 17 C.F.R. § 229.907(a)(1).

The roll-up regulations also required the General Partner to describe any alternatives to the transaction that were considered. 17 C.F.R. § 229.908(b)(1). In this connection, the regulations required the General Partner to describe with reasonable detail the possibility of continuing the partnership in accordance with existing business plans and the possibility of liquidating the partnership. 17 C.F.R. § 229.908(b)(2), (3). The Plaintiffs contend that the General Partner violated these provisions of the roll-up regulations. However, the Solicitation discusses the possibility of borrowing funds to pay the mortgage, liquidation (by sale of the Hotel to a third-party) and continuation of existing arrangements (resulting in foreclosure of the mortgage). The Solicitation discussed the basis for the General Partner's analysis of the situation and its opinion regarding the consequences of each alternative. Therefore,

the Court concludes that the General Partner did not violate 17 C.F.R. § 229.908(b).

Finally, the roll-up regulations required the General Partner to inform the Limited Partners that an independent representative had not been retained on behalf of the Limited Partners and to apprise them of the risks arising from the absence of such representation. 17 C.F.R. § 229.909(b)(1). The Plaintiffs claim that the General Partner failed to comply with this provision of the roll-up regulations. However, the Solicitation repeatedly stated that the General Partner had not retained an independent representative to represent the interests of the Limited Partners. It also disclosed that the General Partner and its affiliates have substantial conflicts of interest with the Limited Partners. Furthermore, the Solicitation disclosed in detail the sources of the conflicts of interest when it described how the General Partner would be increasing its control and its right to distributions while decreasing the liabilities of other Marriott affiliates. Accordingly, the Court concludes that the General Partner did not violate 17 C.F.R. § 229.909(b). Count III of the Plaintiffs' Complaint fails to state a claim for violation of the roll-up regulations and should, therefore, be dismissed.

### D. SECTION 14 EXCHANGE ACT CLAIMS

In Count IV of the Complaint, Plaintiffs assert a claim for violation of Section 14 of the Securities Exchange Act, 15 U.S.C. § 78n. In response to the Motion to Dismiss, the Plaintiffs rely upon the alleged violations of the roll-up regulations issued pursuant to Section 14. Upon careful review of the Complaint, the Court concludes that the Plaintiffs have not pled the elements of a Section 14 claim apart from the roll-up regulation violations. For the reasons set forth above, the Plaintiffs have failed to state a claim with regard to violations of the roll-up regulations. Therefore, Count IV of the Complaint should be dismissed.

### E. SECTION 20 EXCHANGE ACT CLAIMS

In Count V of the Complaint, the Plaintiffs argue that the Marriott Directors and Host Marriott are liable as controlling persons for

the wrongful acts of the General Partner. In view of the Court's ruling with respect to Counts I through IV, there is no basis for imposing liability upon these Defendants for federal securities law violations. Therefore, Count V should be dismissed.

### F. STATE LAW CLAIMS

■ In Counts VI and VII of the Complaint, the Plaintiffs assert claims for breach of fiduciary duty and breach of contract. These state law claims are adequately pled and are not subject to Rule 9(b) or the Reform Act. There is diversity jurisdiction over these claims. Defendants argue that this Court should abstain from ruling upon the state law claims because an identical case has been filed in Delaware Chancery Court. In 1971, the United States Supreme Court held that federal courts should abstain from the exercise of subject matter jurisdiction where the court is called upon to enjoin an ongoing state criminal proceeding. *Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971). Abstention is required in such a case because we operate in "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Id.* However, there is a strong presumption in favor of the Court exercising its jurisdiction; abstention should be the exception and not the rule. *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 15, 103 S.Ct. 927, 936, 74 L.Ed.2d 765, (1983); *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

■ The Abstention Doctrine has been expanded over the years to allow abstention from civil cases on various grounds. In *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the Supreme Court recognized judicial economy as a legitimate basis for abstention. A court considering *Colorado River* abstention should consider six factors: (1) whether the state and federal courts have assumed jurisdiction over the same res; (2) the inconvenience of the federal forum; (3) the potential for piecemeal litigation; (4) the relative progress in the state and federal proceedings; (5) whether federal or state law will apply; and (6) the adequacy of the state court's ability to protect the parties' rights. *See also, American Bankers Ins. Co. of Florida v. First State Ins. Co.,* 891 F.2d 882, 884 (11th Cir.1990). The factors guiding the abstention decision are not to be mechanistically applied. Under any given set of circumstances a factor may be given great weight or little weight depending on its relevance to the facts. *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 15, 103 S.Ct. 927, 936, 74 L.Ed.2d 765, (1983).

The Eleventh Circuit has recently restated the rule that "[a]bstention from the exercise of federal jurisdiction is the exception not the rule." *Metropolitan Life v. Lockette,* 155 F.3d 1339, 1341 (11th Cir.1998). Proper weight must be given to the Court's obligation to exercise jurisdiction when a related state court action is pending. *Id.* While the Court is confident that the Delaware Chancery Court would adequately protect the parties' rights, it finds no other support for taking the extraordinary step of abstaining from this case. This Court is under an obligation to adjudicate the cases that properly come before it and will not refuse to do so without a compelling reason. Therefore, the Court will exercise jurisdiction over this case.

### IV. THE MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

■ The Individual Defendants move to dismiss the Complaint against them for lack of personal jurisdiction. When no evidentiary hearing is held for a motion to dismiss for lack of jurisdiction, the plaintiff needs to present only a *prima facie* showing that venue and personal jurisdiction are proper. *Bracewell v. Nicholson Air Services, Inc.,* 748 F.2d 1499, 1504 (11th Cir. 1984); *Jetco Electronic Industries, Inc. v. Gardiner,* 473 F.2d 1228, 1232 (5th Cir.1973); *Psychological Resources Support Systems v. Gerleman,* 624 F.Supp. 483, 484 (N.D.Ga. 1985). The Court accepts the facts as al-

leged in the Complaint to the extent the Defendants do not challenge them by submitting affidavits. *Black v. Acme Markets, Inc.,* 564 F.2d 681, 683, n. 3 (5th Cir.1977); *National Egg Co. v. Bank Leumi Le-Israel B.M.,* 504 F.Supp. 305, 309 (N.D.Ga.1980). When there is conflicting evidence the court should err in favor of the Plaintiff. *Psychological Resources Support Systems,* 624 F.Supp. at 486–87; *Vest v. Waring,* 565 F.Supp. 674, 693 (N.D.Ga.1983) (all pleadings and affidavits introducing evidence relating to jurisdictional facts are to be construed in the light most favorable to the plaintiff).

In view of the Court's dismissal of the Plaintiffs' federal securities fraud claims, there is no jurisdiction pursuant to 15 U.S.C. §§ 77v and 78aa. Therefore, the Court must look to the Georgia Long Arm Statute to determine whether there is jurisdiction over the nonresident Defendants. There are four questions that must be answered to find that the nonresident Individual Defendants have sufficient minimum contacts to permit the exercise of personal jurisdiction consistent with the Georgia Long Arm Statute, O.C.G.A. § 9–10–91, and due process. *U.S. S.E.C. v. Carrillo,* 115 F.3d 1540 (11th Cir. 1997); *Francosteel Corp. v. M/V Charm,* 19 F.3d 624, 626–627 (11th Cir.1994); *Allegiant Physicians Services, Inc. v. Sturdy Memorial Hosp.,* 926 F.Supp. 1106, 1112–1113 (N.D.Ga.1996). The first question is whether the Individual Defendants' contacts with the state were sufficiently related to the Plaintiffs' cause of action. *U.S. S.E.C.* at 1542. The court must then decide whether the Individual Defendants purposefully availed themselves of the privileges and benefits of conducting its activities in Georgia. *Id.* at 1545. Third, the court must consider whether the Individual Defendants could have expected to be haled into court in Georgia. *Id.* at 1546. Finally, the court must conclude that subjecting the Individual Defendants to the jurisdiction of a federal court in Georgia does not offend the notion of fair play and substantial justice. *Id.* at 1547.

 As to the first inquiry, the Individual Defendants have traveled to Atlanta on several occasions as directors of the General Partner. These trips were related to the operation of the Limited Partnership. Furthermore, the Individual Defendants are directors for the General Partner that solicited votes for the merger from Limited Partners located in Georgia. The actions of the General Partner in connection with the restructuring of the Limited Partnership are the subject matter of this action. Accordingly, the Defendants' contacts are related to both the State of Georgia and the Plaintiffs' cause of action. The second requirement, purposeful availment, assures that a defendant will not be haled into a jurisdiction because of random, fortuitous, or attenuated contacts or because of the unilateral activity of a third person. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174; *Helicopteros,* 466 U.S. at 417, 104 S.Ct. 1868. Jurisdiction is proper where the defendants' contacts with the forum proximately result from actions by the defendants themselves that create a "substantial connection" with the forum state. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. The foreseeability critical to the proper exercise of personal jurisdiction is the defendant's ability to see that his purposeful acts will have some effect in the forum. *See Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). There is no suggestion that the Individual Defendants' contacts with Georgia were random, fortuitous, nor attenuated. They were methodical, purposeful and significant. They resulted from their decisions as directors of the General Partner of the Limited Partnership whose sole asset is a hotel located in Atlanta, Georgia. The Individual Defendants must have foreseen that their decisions as directors of the Limited Partnership would affect this forum and potentially subject them to jurisdiction here.

 The next question is whether the Individual Defendants could reasonably have expected to be haled into court in Georgia. It would defy common sense and logic to hold that the Individual Defendants could not reasonably anticipate being haled into a Georgia court when they voluntarily decided to operate a Limited Partnership whose only purpose was the operation of a hotel located in Atlanta, Georgia. *See, e.g., U.S. S.E.C.,* 115 F.3d at 1547. Finally, the Court must conclude that its exercise of jurisdiction over the Individual Defendants would not offend notions of fair play and

substantial justice. The Individual Defendants bear the burden of showing that the Court's exercise of jurisdiction fails this test. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 947 (11th Cir.1997). The evaluation of fair play and substantial justice involves a balancing of the burden that litigation in this forum would place upon the Individual Defendants, the State's interest in having the litigation conducted here, and the Plaintiffs' interest in obtaining relief. *U.S. S.E.C.*, 115 F.3d at 1547. While the Individual Defendants may have to travel a fair distance to defend themselves in this forum, modern transportation and communication have alleviated this sort of burden. *Panama*, 119 F.3d at 947; *U.S. S.E.C.*, 115 F.3d at 1547. Furthermore, the Individual Defendants have previously made this trip on business related to the operation of the hotel. Finally, while the Court recognizes that the Plaintiffs may be able to obtain relief elsewhere, the State of Georgia unquestionably has an interest in resolving disputes related to assets located in this state and preventing misleading solicitation of its citizens. Considering the insubstantial burden upon the Individual Defendants and Georgia's strong interest in having this case adjudicated here, the Court concludes that exercise of jurisdiction over the Individual Defendants does not offend notions of fair play and substantial justice and that this Court may properly exercise personal jurisdiction over the Individual Defendants.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [12-1] is GRANTED as to Counts I through V and DENIED as to Counts VI and VII. The Individual Defendants' Motion to Dismiss for Lack of Personal Jurisdiction [13-1] is DENIED.